[L.A. No. 30786. Mar. 27, 1978.]

ROGER A. BRITT et al., Petitioners, v.
THE SUPERIOR COURT OF SAN DIEGO COUNTY,
Respondent;
SAN DIEGO UNIFIED PORT DISTRICT,
Real Party in Interest.

846

---

**COUNSEL**

Fadem, Berger & McIntire, Fadem, Berger, McIntire & Norton, Michael M. Berger and Gregory M. Bergman for Petitioner.

No appearance for Respondent.

Luce, Forward, Hamilton & Scripps, Louis E. Goebel, Michael Scott Gatzke and Walter J. Cummings III for Real Party in Interest.

---

**OPINION**

**TOBRINER, J.**—In this case we must determine the constitutional validity of a judicial discovery order which compels numerous individuals, plaintiffs in the underlying litigation, to disclose extensive and intimate details of both their own and others' activities in various local political associations. The trial court refused to honor plaintiffs' request for a protective order to safeguard their associational privacy and instead ordered plaintiffs to render a wholesale revelation of private associational information. Such information ranged from the disclosure of their own membership in numerous associations to a listing of the names of all persons who attended any meeting of such associations, and finally extended to a description of the subjects discussed at all such meetings. Contending that this wide-ranging order infringes upon their constitutional rights, plaintiffs seek an extraordinary writ to restrain the trial court from requiring such revelations.

For the reasons discussed below, we have concluded that the challenged discovery order cannot be sustained. As we explain, for more than two decades decisions of both the United States Supreme Court and this court, recognizing that compelled disclosure of private associational affiliations or activities will inevitably deter many individuals from exercising their constitutional right of association, have established that such intrusion into associational privacy may be sanctioned only upon the demonstration of a very important, indeed "compelling," state

interest which necessitates the disclosure. Moreover, the authorities additionally demonstrate that even when such justification is present, the scope of the compelled disclosure must be narrowly circumscribed to avoid undue interference with private associational rights. The extensive discovery authorized in the instant case cannot be reconciled with these settled constitutional precepts.

We have further concluded that a separate portion of the discovery order, which permits defendant to inquire without limit into plaintiffs' lifetime medical histories, is also vulnerable to plaintiffs' challenge. As we explain, although in seeking recovery for physical and mental injuries plaintiffs have unquestionably waived their physician-patient and psychotherapist-patient privileges as to all information concerning the medical conditions which they have put in issue, past cases make clear that such waiver extends only to information relating to the *medical conditions in question,* and does not automatically open *all* of a plaintiff's past medical history to scrutiny. Failing to heed the teachings of these governing authorities, the trial court placed absolutely no limit on defendant's efforts to obtain wholesale disclosure of each plaintiff's lifetime medical history. Under these circumstances, we conclude that this aspect of the discovery order should also be vacated.

### 1. *The facts*

The facts in this case are not in dispute. Petitioners (hereafter plaintiffs) are 936 owners and residents of homes located near Lindbergh Field, the San Diego International Airport. Real party in interest (hereafter defendant), the San Diego Unified Port District, owns and operates the airport.

On July 29, 1975, and March 29, 1976, in separate actions which were subsequently consolidated, plaintiffs brought suit against the port district seeking compensation for diminution of property values, personal injuries, and emotional disturbance allegedly caused by the noise, vibrations, air pollution, and smoke associated with defendant's operation of Lindbergh Field as a facility for jet aircraft. Defendant responded by embarking upon a program of extensive discovery. A portion of these extensive discovery efforts gives rise to the issues before us.

In deposing a number of plaintiffs, defendant has attempted to investigate plaintiffs' local political activities in connection with the operation of Lindbergh Field. Specifically, as plaintiffs assert and

defendant concedes, defendant has asked plaintiffs questions regarding: (1) plaintiffs' "membership in various organizations opposed to the . . . way in which the Port District operates its Airport"; (2) any meetings which plaintiffs may have attended "concerning the Airport, including dates, topics and speakers"; (3) any correspondence which plaintiffs received from such organizations; (4) "the identity of other people who attended meetings"; (5) "the content of discussions with others regarding the meetings"; (6) the identity of those persons with whom plaintiffs discussed such matters; and (7) any financial contributions by plaintiffs to such organizations, including the "amount, date, and identity of person requesting funds."

Defendant also asked plaintiffs to produce, at the taking of their depositions, various documents connected with airport political activity. Specifically, defendant requested plaintiffs to bring: "Any and all writings reflecting communications of any form or nature between yourself, or any member of your family, and the Airport Relocation Committee, CRASH, and/or the Loma Portal Civic Club including, but not limited to: Any flyers, mimeographed sheets, forms, applications for membership, pledges of funds, correspondence, notes of conversations, or cancelled checks reflecting payment of any dues, fees or contributions to any such organization."

Defendant sought to mount a similarly wide-ranging inquiry into plaintiffs' medical history. On November 24, 1975, defendant served all 936 plaintiffs with a battery of interrogatories. In addition to requiring plaintiffs to answer detailed questions concerning the physical and mental injuries which defendant's activities allegedly caused, the interrogatories also demanded of plaintiffs a complete account of their entire medical history, encompassing all illnesses, physical injuries, and mental or emotional disturbances for which plaintiffs sought treatment at any time during their lives.[1]

---

[1]The breadth of defendant's inquiry is exemplified by the following interrogatories which were among 50 interrogatories (designated First Set) served on all plaintiffs:

"1.37 *Other than* the personal injuries which are claimed by you to have proximately resulted from the matters alleged in your complaint in this action, have you *ever* received any kind of *injury* following which you sought medical treatment or medical examination?" (Original italics.)

"1.38 If the answer to number 1.37 is yes, please state:

"(a) The date of each such injury.

"(b) The nature of each such injury.

"(c) The names and addresses of each doctor, physician, or healer who treated you for each such injury.

"(d) The name and address of each hospital at which you were a patient or where you

Several plaintiffs refused to answer defendant's deposition questions. On March 4, 1976, plaintiffs moved the trial court for a protective order to restrain defendant's investigations of plaintiffs' political associations and medical histories. Asserting that their political associations were constitutionally privileged, plaintiffs also challenged the legal propriety of defendant's unlimited demands for medical information. That same day, defendant moved the trial court for an order compelling plaintiffs to answer its questions. On March 23, 1976, the trial court denied plaintiffs' motion for a protective order, granted defendant's motion to compel answers to its deposition questions, and fixed a deadline for plaintiffs' answers to defendant's interrogatories.

Plaintiffs thereafter filed the instant petition seeking extraordinary relief. Concluding that the trial court order that compelled the disclosure of extensive information as to the private associational activities of plaintiffs and numerous nonparties raised significant and novel constitutional issues of general importance, we issued an alternative writ. (See, e.g., *Oceanside Union School Dist.* v. *Superior Court* (1962) 58 Cal.2d 180, 185-186, fn. 4 [23 Cal.Rptr. 375, 373 P.2d 439]; *Pacific Tel. & Tel. Co.* v. *Superior Court* (1970) 2 Cal.3d 161, 169, 171 fn. 11 [84 Cal.Rptr. 718, 465 P.2d 854].) In issuing that order, we determined that review by

---

were treated for each such injury.

"(e) A brief description of where and how you received each such injury.

"(f) What drugs, narcotics, or other medications were prescribed, given to, or utilized by you with respect to any such injury or illness."

"1.41 *Other than* the personal injuries claimed by you to have proximately resulted from the matters alleged in your complaint in this action, have you ever consulted a doctor, physician, psychologist, psychiatrist, healer, or other professional counselor with respect to any *emotional or mental injury, illness, disturbance or condition*?" (Original italics.)

"1.42 If the answer to number 1.41 is yes, please state:

"(a) The date or dates during which you were affected by each such emotional or mental injury, illness, disturbance or condition.

"(b) The name and address of each doctor, physician, psychologist, psychiatrist, healer or other professional counselor who treated you with respect to each such mental or emotional injury, illness, disturbance or condition.

"(c) The date or dates upon which each person identified in your answer to number 1.42(b) rendered such treatment to you.

"(d) The name and address of each hospital, sanitorium, or other institution where you were a patient with respect to any such mental or emotional injury, illness, disturbance or condition.

"(e) What drugs, narcotics, or other medications were prescribed, given to, or utilized by you with respect to any such mental or emotional injury, illness, disturbance or condition.

"(f) The nature and duration of all treatment given to you for each such mental or emotional injury or illness."

extraordinary writ is appropriate in this case (see, e.g., *People* ex rel. *Younger* v. *County of El Dorado* (1971) 5 Cal.3d 480, 492 [96 Cal.Rptr. 553, 487 P.2d 1193]) and thus we turn immediately to the merits of the challenged discovery order.

2. ▆ *In compelling the wholesale disclosure of private association affiliations and activities, the challenged discovery order works an unconstitutional infringement of First Amendment rights and goes far beyond any limited disclosure that defendant's legitimate litigation interests may justify.*

The discovery order at issue compels plaintiffs to expose to detailed scrutiny information concerning both their own and others' affiliations with, and activities in, organizations which, at various times, have protested operations at the San Diego airport and have attempted through traditional political efforts to influence the future conduct of such operations. In evaluating the propriety of this order, we recognize at the outset that such peaceful and lawful associational activity is, without question, constitutionally protected activity which, under both our state and federal Constitutions, enjoys special safeguard from governmental interference. (Cal. Const., art. I, §§ 1, 2, 3; U.S. Const., 1st Amend.) Defendant port district does not contest the constitutionally sanctioned nature of such associational activities, but instead argues initially that because the discovery order at issue does not prohibit the exercise of any such activities but merely requires their disclosure, the order is not vulnerable to constitutional attack.

As both the United States Supreme Court and this court have observed time and again, however, First Amendment freedoms, such as the right of association, "are protected not only against heavy-handed frontal attack, but also from being stifled by more subtle governmental interference." (*Bates* v. *Little Rock* (1960) 361 U.S. 516, 523 [4 L.Ed.2d 480, 485, 80 S.Ct. 412]; see, e.g., *White* v. *Davis* (1975) 13 Cal.3d 757, 767 [120 Cal.Rptr. 94, 533 P.2d 222].) Indeed, numerous cases establish that compelled disclosure of an individual's private associational affiliations and activities, such as that at issue in the instant case, frequently poses one of the most serious threats to the free exercise of this constitutionally endowed right.

As the United States Supreme Court emphasized nearly 20 years ago in *N.A.A.C.P.* v. *Alabama* (1958) 357 U.S. 449, 462 [2 L.Ed.2d 1488, 1499-1500, 78 S.Ct. 1163], the seminal decision in this field: "It is hardly

a novel perception that compelled disclosure of affiliation with groups engaged in advocacy may constitute [an] effective . . . restraint on freedom of association . . . This Court has recognized the vital relationship between freedom to associate and privacy in one's associations. . . . Inviolability of privacy in group association may in many circumstances be indispensable to preservation of freedom of association, particularly where a group espouses dissident beliefs." (See, e.g., *Bates* v. *Little Rock, supra,* 361 U.S. 516, 523 [4 L.Ed.2d 480, 485]; *Talley* v. *California* (1960) 362 U.S. 60, 64-65 [4 L.Ed.2d 559, 562-563, 80 S.Ct. 536]; *Huntley* v. *Public Util. Com.* (1968) 69 Cal.2d 67, 72-73 [69 Cal.Rptr. 605, 442 P.2d 685].)[2]

Defendant argues, however, that the *NAACP* decision and its progeny do not apply to the present case. Whereas the NAACP was a largely unpopular organization in Alabama in the late 1950's whose members were frequently subject to threats and physical violence, defendant emphasizes that plaintiffs have not demonstrated that the organizations in question here are similarly unpopular or that the revelation of their membership will expose individuals to comparable harm. In essence, defendant contends that the constitutional interest in associational privacy upheld in past decisions attaches only to members of dissident

[2]To support its claim that the present discovery order is not susceptible to constitutional challenge, defendant relies heavily on a federal district court decision, *Independent Productions Corp.* v. *Loew's, Incorporated* (S.D.N.Y. 1958) 22 F.R.D. 266, in which the court refused to recognize any First Amendment privilege to withhold information relating to political association. The *Independent Productions* decision, however, primarily rested on the district court's conclusion that the First Amendment did not "relate to the privilege of silence" (22 F.R.D. at p. 275), a proposition that was, of course, soon explicitly rejected by the United States Supreme Court in its subsequent decision in *N. A. A. C. P.* v. *Alabama.* In view of this most fundamental constitutional flaw, the *Independent Productions* decision clearly provides no proper constitutional guidance for the instant case.

Similarly, the United States Supreme Court opinion in *Branzburg* v. *Hayes* (1972) 408 U.S. 665 [33 L.Ed.2d 626, 92 S.Ct. 2646], relied upon by defendant at oral argument, does not support the district's position. In *Branzburg* the court, in a five to four decision, held that the First Amendment did not provide a news reporter with a privilege to refuse to respond to a grand jury subpoena in a criminal proceeding, but Justice White's opinion for the majority was careful to point out that the decision did not affect the vitality of *N. A. A. C. P.* v. *Alabama* or its progeny (408 U.S. at p. 700 [33 L.Ed.2d at pp. 650-651]), and Justice Powell's concurring opinion emphasized that the holding did not alter traditional First Amendment principles in this area. (408 U.S. at pp. 709-710 [33 L.Ed.2d at pp. 655-656]. See also *Saxbe* v. *Washington Post Co.* (1974) 417 U.S. 843, 859-860 [41 L.Ed.2d 514, 525-526, 94 S.Ct. 2811] (dis. opn. by Powell, J.).) In *Buckley* v. *Valeo* (1976) 424 U.S. 1, 64-68 [46 L.Ed.2d 659, 713-716, 96 S.Ct. 612], a post-*Branzburg* decision, the Supreme Court emphatically reaffirmed the continuing validity of the *N. A. A. C. P.* v. *Alabama* line of decisions.

organizations and does not embrace those who choose to participate in organizations which may enjoy more general popularity.

■ Although past cases have frequently acknowledged that the "chilling effect" of compelled disclosure most severely affects organizations espousing unorthodox or unpopular views (see, e.g., *Watkins* v. *United States* (1957) 354 U.S. 178, 197 [1 L.Ed.2d 1273, 1289-1290, 77 S.Ct. 1173]), the governing authorities do not support defendant's assertion that constitutional protection of anonymity of affiliation is *limited* to members of such groups. In *Shelton* v. *Tucker* (1960) 364 U.S. 479 [5 L.Ed.2d 231, 81 S.Ct. 247], for example, the United States Supreme Court struck down in its entirety a state statute which required public teachers to disclose all associations to which they had belonged in the past 10 years, drawing no distinction between the statute's application to "popular" and "unpopular" organizations. (See also *Talley* v. *California, supra,* 362 U.S. 60; *Baird* v. *State Bar of Arizona* (1971) 401 U.S. 1, 6 [27 L.Ed.2d 639, 646-647, 91 S.Ct. 702].) Moreover, in *Gibson* v. *Florida Legislative Comm.* (1963) 372 U.S. 539, 556 [9 L.Ed.2d 929, 941, 83 S.Ct. 889], the Supreme Court specifically refuted defendant's present contention, declaring that "*all legitimate organizations* are the beneficiaries of these [privacy of association] protections. . . ." (Italics added.) As Justice Douglas' concurrence in *Gibson* reiterated: "[*W*]*hether a group is popular or unpopular,* the right of privacy implicit in the First Amendment creates an area into which the Government may not enter." (Italics added.) (372 U.S. at p. 570 [9 L.Ed.2d at p. 949]. See also *Buckley* v. *Valeo, supra,* 424 U.S. 1, 64-68 [46 L.Ed.2d 659, 713-716]; *Pollard* v. *Roberts* (E.D.Ark. 1968) 283 F.Supp. 248, 258 (3-judge court), affd. *per curiam* (1968) 393 U.S. 14 [21 L.Ed.2d 14, 89 S.Ct. 47].)

The facts of the present case demonstrate the propriety of affording constitutional protection to the privacy interests of members of *all* politically oriented associations. Although the aims of the local associations involved in this case may find general support among San Diego residents, an individual's participation in such advocatory organizations could nonetheless raise the ire of municipal authorities or other individuals or business entities who have substantial interests in the maintenance or expansion of current airport operations. As the United States Supreme Court explained in *Shelton* v. *Tucker, supra,* 364 U.S. 479, 486 [5 L.Ed.2d 231, 236], one of the principal purposes of the constitutional protection of associational privacy is to free an individual to follow the dictates of his conscience by ensuring that he need not "avoid any ties [simply because they] might displease those who control

his [personal or] professional destiny. . . ." (See *Lamont v. Postmaster General* (1965) 381 U.S. 301, 307 [14 L.Ed.2d 398, 402, 85 S.Ct. 327]; *In re Stolar* (1971) 401 U.S. 23, 27-28 [27 L.Ed.2d 657, 662-663, 91 S.Ct. 713].) If the constitutional protection of associational privacy were to be completely withheld from selected organizations simply because they were not sufficiently unpopular, the inevitable effect would be to deter many individuals, particularly those who may be most vulnerable to retaliation by those opposed to such organizations' aims, from participating in such constitutionally protected activities. (See, e.g., *Pollard* v. *Roberts, supra,* 283 F.Supp. 248, 258.)

■ Accordingly, we reject defendant's contention that the "nondissident" nature of the private associations in question immunizes the present discovery order from First Amendment attack. In view of the sweeping scope of the discovery order at issue, we think it clear that such order "is likely to pose a substantial restraint upon the exercise of First Amendment rights. . . ." (*White* v. *Davis, supra,* 13 Cal.3d 757, 772.)

■ Of course, as with all other First Amendment rights, the right of associational privacy is not absolute, and past cases recognize that under some circumstances disclosure may permissibly be compelled. (See, e.g., *Buckley* v. *Valeo, supra,* 424 U.S. 1, 66-68 [46 L.Ed.2d 659, 714-716].) Because of the constitutional interests at stake, however, the authorities establish that private association affiliations and activities such as those at issue here "are presumptively immune from inquisition. . . ." (*Sweezy* v. *New Hampshire* (1957) 354 U.S. 234, 265-266 [1 L.Ed.2d 1311, 1332-1333, 77 S.Ct. 1203] (Frankfurter, J. conc.)), and thus the government bears the burden of demonstrating the justification for compelling disclosure. (See, e.g., *Baird* v. *State Bar of Arizona, supra,* 401 U.S. 1, 6-7 [27 L.Ed.2d 639, 646-647].) Moreover, the cases also make clear that in this context the government's burden is a particularly heavy one: "[T]o justify any impairment there must be present [a] 'compelling state interest . . . [which] justifies the substantial infringement of . . . First Amendment rights. It is basic that no showing merely of a rational relationship to some colorable state interest would suffice; in this highly sensitive constitutional area "[o]nly the gravest abuses, endangering paramount interests, give occasion for permissible limitation," [citation].' " (*Huntley* v. *Public Util. Com., supra,* 69 Cal.2d at p. 74; see, e.g., *Buckley* v. *Valeo, supra,* 424 U.S. 1, 64 [46 L.Ed.2d 659, 713].)

Finally, the decisions establish that not only must disclosure serve a "compelling" state purpose, but that such "purpose cannot be pursued

by means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved." (*Shelton* v. *Tucker, supra,* 364 U.S. 479, 488 [5 L.Ed.2d 231, 237].) As this court explained a decade ago in *Vogel* v. *County of Los Angeles* (1967) 68 Cal.2d 18, 22 [64 Cal.Rptr. 409, 434 P.2d 961]: "Even where a compelling state purpose is present, restrictions on the cherished freedom of association . . . must be drawn with narrow specificity. . . . Precision of [compelled disclosure] is required so that the exercise of our most precious freedoms will not be unduly curtailed except to the extent necessitated by the legitimate governmental objective." (See, e.g., *Fort* v. *Civil Service Commission* (1964) 61 Cal.2d 331, 337 [38 Cal.Rptr. 625, 392 P.2d 385]; *Pollard* v. *Roberts, supra,* 283 F.Supp. 248, 257; *Bursey* v. *United States* (9th Cir. 1972) 466 F.2d 1059, 1083.)

Defendant attempts, on a variety of grounds, to justify the challenged discovery order under these established authorities but, as we shall explain, none of defendant's contentions sustain the wide-ranging and deep-probing inquiries at issue here.

First, defendant maintains that because the disclosures in the instant case have been compelled pursuant to discovery in connection with a *private* lawsuit, and not in furtherance of any independent governmental inquiry into private associational activity, the state's substantial interest in facilitating the ascertainment of truth in such private litigation justifies the present order. Relying upon the general public policy in favor of disclosure in litigation embodied in California's broad discovery statutes, defendant in essence argues that First Amendment associational privacy interests must invariably give way to any discovery effort undertaken in connection with pending litigation.[3]

---

[3]In the instant case, the compelled disclosure is clearly a product of "state action," since both the party seeking disclosure (the port district) and the court which has ordered disclosure are governmental entities; thus, strictly speaking, we need not determine whether First Amendment principles also restrain discovery orders issued in connection with litigation involving solely private parties. Nonetheless, in light of the considerations discussed in text and the fact that in this area, judicial discovery orders inevitably involve *state-compelled* disclosure of presumptively protected information, the principles have equal application to purely private litigation. In an analogous context, a number of federal courts have held that discovery orders compelling the disclosure of news sources in connection with pending civil litigation are subject to First Amendment constraints. (See, e.g., *Carey* v. *Hume* (D.C.Cir. 1974) 492 F.2d 631, 634-636; *Baker* v. *F & F Investment* (2d Cir. 1972) 470 F.2d 778, 783; *Cervantes* v. *Time, Inc.* (8th Cir. 1972) 464 F.2d 986, 992-995; accord *Free* v. *Buckingham* (1879) 59 N.H. 219, 225 (First Amendment bars inquiry into witness' religious beliefs in private litigation).)

We recognize, of course, "the historically important state interest of facilitating the ascertainment of truth in connection with legal proceedings" (*In re Lifschutz* (1970) 2 Cal.3d 415, 432 [85 Cal.Rptr. 829, 467 P.2d 557, 44 A.L.R.3d 1]) and we do not question the significance or legitimacy of the pursuit of this state interest. As we recently observed in a similar context, however, "the identification of [such a] legitimate interest is just the beginning point of analysis . . ., not, as defendant suggests, the conclusion." (*White* v. *Davis, supra,* 13 Cal.3d 757, 766.) "In this realm, as in all others, the permissible limits of governmental action are circumscribed by the federal Bill of Rights and the comparable protections of our state Constitution." (*Id.*)

As we have seen, the source of the constitutional protection of associational privacy is the recognition that, as a practical matter, compelled disclosure will often deter such constitutionally protected activities as potently as direct prohibition. This chilling effect on First Amendment rights is not diminished simply because disclosure is compelled pursuant to a litigation-oriented discovery order. Indeed, in some respects, the threat to First Amendment Rights may be more severe in a discovery context, since the party directing the inquiry is a litigation adversary who may well attempt to harass his opponent and gain strategic advantage by probing deeply into areas which an individual may prefer to keep confidential.

Accordingly, the fact that the state-compelled disclosure in this case arises out of a litigation-oriented discovery order does not in itself exempt the order from general First Amendment principles. Indeed, the United States Supreme Court decision in *N. A. A. C. P.* v. *Alabama, supra,* itself establishes this proposition beyond question, for the compelled disclosure invalidated in that case had in fact been embodied in a discovery order issued in connection with a pending lawsuit. (357 U.S. at pp. 453-454 [2 L.Ed.2d at pp. 1494-1495].)

In the instant case, unlike *NAACP,* however, the discovery order in question requires disclosure by plaintiffs, rather than by a defendant, and the port district contends that this difference justifies the challenged order. The district argues that a party cannot both prosecute a lawsuit and at the same time foreclose discovery of associational activities which may conceivably relate to the litigation. Defendant contends, in effect, that by bringing the instant lawsuit plaintiffs have completely waived their right to associational privacy.

We do not deny the efficacy of the district's general proposition when applied to some situations. In a number of contexts in which evidentiary privileges generally provide a cloak of confidentiality, exceptions to such privileges have been recognized as to information that relates to an issue which has been posited by the party claiming the privilege's protection. Thus, for example, under current California statutes both the physician-patient privilege and the psychotherapist-patient privilege are subject to a "patient-litigant" exception (see Evid. Code, §§ 996, 1016; cf. Evid. Code, §§ 958, 972, subds. (a), (c)) and, in the constitutional realm, the privilege against self-incrimination has been held to be subject to a similar "waiver" exception as to matters which are directly relevant to litigation commenced by the holder of the privilege. (See, e.g., *Shepherd* v. *Superior Court* (1976) 17 Cal.3d 107, 117 [130 Cal.Rptr. 257, 550 P.2d 161]; *Lyons* v. *Johnson* (9th Cir. 1969) 415 F.2d 540, 542.)

. While these precedents in analogous areas suggest that, to at least some extent, a plaintiff may well waive his right of associational privacy by bringing a lawsuit, this argument for a number of reasons does not justify the extensive discovery sanctioned by the trial court in the instant case.

First, the disclosures compelled by the challenged court order reach far beyond the privacy interests of the plaintiffs in the instant litigation and directly impinge on the constitutional rights of numerous individuals who have taken no action whatsoever with respect to the underlying lawsuit. As we have seen, in addition to the disclosure of plaintiffs' affiliation and activities in the local anti-airport organizations, the challenged discovery order compels the disclosure of the names of all other persons who have either spoken at, or who have *merely attended,* any of the various organizations' numerous meetings. These nonlitigants have clearly not waived their constitutional right of associational anonymity and, consequently, insofar as defendant seeks to justify the challenged order on a waiver theory, the challenged order is unquestionably overbroad as applied to such nonlitigants.

Second, even as to the named plaintiffs, the challenged order is likewise impermissibly overbroad. As we have already noted, the "waiver" concept urged by defendant here parallels the waiver principles implicit in the statutory "patient-litigant" exception to the California psychotherapist-patient privilege. In *In re Lifschutz, supra,* 2 Cal.3d 415, a defendant in a personal injury suit claimed, much like the port district, that by commencing the lawsuit the plaintiff had broadly waived any

right to claim the psychotherapist-patient privilege in connection with the litigation. Explaining that such an expansive rendition of the scope of a plaintiff's waiver would "effectively deter many psychotherapeutic patients from instituting any general claim for mental suffering and damage out of fear of opening up all past communications to discovery" and "would clearly be an intolerable and overbroad intrusion into the patient's privacy," we concluded that the waiver of privilege contemplated by the patient-litigant exception "must be construed not as a complete waiver of the privilege but only as a limited waiver . . . with respect to *those mental conditions* the patient-litigant has 'disclose[d] . . . by bringing an action in which *they* are at issue' . . . ." (Original italics.) (2 Cal.3d at p. 435.)

■ By parity of reasoning, we conclude that while the filing of a lawsuit may implicitly bring about a partial waiver of one's constitutional right of associational privacy, the scope of such "waiver" must be narrowly rather than expansively construed, so that plaintiffs will not be unduly deterred from instituting lawsuits by the fear of exposure of their private associational affiliations and activities. (See, e.g., *Familias Unidas* v. *Briscoe* (5th Cir. 1976) 544 F.2d 182, 185-186, 192.) When such associational activities are *directly relevant* to the plaintiff's claim, and disclosure of the plaintiff's affiliations is essential to the fair resolution of the lawsuit, a trial court may properly compel such disclosure. (Cf. *Carey* v. *Hume, supra,* 492 F.2d 631, 634-639.) Even under such circumstances, however, the general First Amendment principles noted above dictate that the compelled disclosure be narrowly drawn to assure maximum protection of the constitutional interests at stake.

■ In the instant case, plaintiffs commenced their actions to attempt to recover damages for both personal injuries and the diminution of property values allegedly caused by defendant's operation of the San Diego airport. From all appearances, plaintiffs' complaints do not relate to, nor put in issue, any aspect of their private associational conduct. Plaintiffs do not seek recovery for any damage to their associational interests, do not claim that any of these injuries were incurred while pursuing associational activities and do not request any relief with respect to the port district's relationship with such associations. The success of plaintiffs' actions will thus turn on questions of proof concerning the scope and propriety of the airport's operations and the connection of such operations with the injuries allegedly suffered by plaintiffs; plaintiffs' constitutionally protected associational activities, even those concerned with protesting airport operations, appear quite

unrelated to the matters placed at issue by plaintiffs' complaints. Under these circumstances, we conclude that plaintiffs have not waived the constitutional privacy interests at issue here.

Defendant contends, however, that even if plaintiffs have not waived their First Amendment rights, its inquiry is nonetheless justified under the "compelling interest" standard because plaintiffs' associational activities may be relevant to several potential defenses upon which defendant may wish to rely: statute of limitations, res judicata and failure to mitigate damages. As we explain in the margin, the relationship of such activities to the suggested defenses is extremely tenuous at best; we seriously doubt that the district has made the requisite showing even to justify the disclosure of presumptively privileged information which directly relates to such defenses. (See *N. A. A. C. P.* v. *Alabama, supra,* 357 U.S. 449, 463-465 [2 L.Ed.2d 1488, 1500-1501].)[4] In evaluating

---

[4]Defendant initially speculates that plaintiffs' private associational activities may conceivably bear some relevance to its planned statute of limitations defense. As recent cases have explained, the designation of a date upon which the statute of limitations begins to run in airport overflight and inverse condemnation suits is difficult since typically no single date can be fixed upon which a constitutional "taking" or "damaging" has clearly occurred. (See, e.g., *Aaron* v. *City of Los Angeles* (1974) 40 Cal.App.3d 471, 491-492 [115 Cal.Rptr. 162]; *Jensen* v. *United States* (9th Cir. 1962) 305 F.2d 444, 447.) Because the landowner bears the burden of determining when a gradually increasing inconvenience has finally caused sufficient damage to be actionable, courts have been liberal in fixing a date upon which the statute of limitations begins to run (see, e.g., *Pierpont Inn, Inc.* v. *State of California* (1969) 70 Cal.2d 282, 292-294 [74 Cal.Rptr. 521, 449 P.2d 737]; *Nestle* v. *City of Santa Monica* (1972) 6 Cal.3d 920, 937-938 [101 Cal.Rptr. 568, 496 P.2d 480]) and have indicated that a great variety of factors may be considered, including " 'the frequency and level of the flights; the type of planes; the accompanying effects, such as noise and falling objects; the uses of the property; the effect on values; the reasonable reactions of the humans below, and the impact upon animals and vegetable life.' " (*Aaron* v. *City of Los Angeles, supra,* 40 Cal.App.3d at pp. 491-492.)

Seeking to take advantage of this broad calculus of factors, the district maintains that a plaintiff's associational activities may possibly relate to this issue because they may disclose when a plaintiff first became so significantly annoyed at the airport operations that it would be reasonable to have expected him to file suit. None of the precedents, however, indicates that a plaintiff's subjective annoyance provides a proper basis for resolving the statute of limitations issue (see, e.g., *Mehl* v. *People* ex rel. *Dept. Pub. Wks.* (1975) 13 Cal.3d 710, 717 [119 Cal.Rptr. 625, 532 P.2d 489]); indeed, in *Aaron* v. *City of Los Angeles, supra,* the Court of Appeal specifically observed: "[T]he cause of action did not accrue at the point the homeowners first became annoyed. As pointed out in *Jensen* [v. *United States, supra*], some annoyance must be borne without compensation. It is only when the flights substantially interfered with the use and enjoyment of plaintiffs' properties and resulted in a diminution of the market value that a cause of action arose." (40 Cal.App.3d at p. 492.) Moreover, even if the local organizations' political activities could, on some other theory, conceivably bear on the issue of the statute of limitations, defendant has not demonstrated that its wide-ranging discovery is narrowly tailored to disclose facts relevant to such a theory.

Defendant also maintains that plaintiffs' organizational affiliations potentially relate to

the constitutional propriety of the instant discovery order, however, we need not definitively resolve that question, for even if we assume that the issues raised by defendant might justify an order which compelled plaintiffs to make limited disclosures directed to such issues, the instant order is not so confined.

Instead of carefully delimiting the areas of private associational conduct as to which defendant has demonstrated a compelling need for disclosure, the challenged court order opens virtually all of the associations' most intimate information to wholesale disclosure, requiring, inter alia, the revelation of the names of all persons who have attended association meetings, the dates and subject matter of all such meetings, and details of the association's finances and contributions. As already noted, such revelations go far beyond the simple compelled disclosure of organizational affiliations which have routinely been struck down in prior decisions. (E.g., *N. A. A. C. P.* v. *Alabama, supra*; *Bates* v. *Little Rock, supra*; *Shelton* v. *Tucker, supra*; *Gibson* v. *Florida Investigative Comm., supra*; cf. *White* v. *Davis, supra.*)

The very breadth of the required disclosure establishes that the trial court in this case did not apply traditional First Amendment analysis in passing on the validity of defendant's inquiries into the private associational realm, and in particular did not heed the constitutional mandate that "[p]recision of [disclosure] is required so that the exercise of our most precious freedoms will not be unduly curtailed. . . ." (*Vogel* v. *County of Los Angeles, supra*, 68 Cal.2d 18, 22; see, e.g., *Pollard* v.

---

its maintenance of a res judicata defense based on this court's decision in *Loma Portal Civic Club* v. *American Airlines, Inc.* (1964) 61 Cal.2d 582 [39 Cal.Rptr. 708, 394 P.2d 548]. In *Loma Portal* our court held that the trial court had properly refused to enjoin certain activities of airlines operating out of the San Diego airport, but that decision, unlike the present action, did not involve any claim for damages, and the opinion makes clear that the issue of monetary liability was not before the court (61 Cal.2d at p. 586); accordingly, we doubt that the decision could work any res judicata effect on the instant case. Moreover, in any event, this issue clearly could not justify the broad disclosures sought by defendant, but at most would warrant only an inquiry into whether a plaintiff was a member of the Loma Portal Civic Club at the time of the prior litigation.

Finally, defendant asserts that plaintiffs' private associational activity might somehow bear on whether plaintiffs have failed "to mitigate damages." Although defendant does not fully explain the legal basis of such a defense, defendant apparently believes that it should be permitted to probe plaintiffs' associational activities to determine whether plaintiffs' discussions at any meeting indicate that they were aware of the challenged operations at the time they moved to their present residence. On its face this contention is purely speculative, and if plaintiffs' knowledge of the airport operations at the time of their purchase of property has any bearing on this action at all, defendant must attempt to obtain that information by means other than a wholesale invasion of plaintiffs' constitutionally protected associational privacy.

*Roberts, supra,* 283 F.Supp. 248, 257-259.) Under these circumstances, we conclude that the challenged discovery order is constitutionally infirm.[5]

3. ■ *The trial court also erred in requiring plaintiffs to make unlimited disclosure of their lifetime medical histories.*

As noted at the outset, in addition to attacking the compelled disclosure of their private associational activities, plaintiffs also challenge a portion of the trial court's discovery order which compels them to disclose to defendant their entire lifetime medical histories. (See fn. 1, *ante.*) Plaintiffs stress, in this regard, that while they are completely willing to provide defendant with medical information which relates in any way to the physical or emotional injuries for which they seek recovery in the underlying action—and, indeed, that they have already done so[6]—they object to the trial court's unlimited order which requires them to comply with defendant's request for information related to *all* past medical conditions, without regard to whether such conditions have any bearing on the present litigation. The port district argues, in response, that the broad discovery order properly affords it the opportunity to determine for itself whether the injuries, which plaintiffs assert were caused by airport operations, actually arose from other medical conditions.

To assess the validity of plaintiffs' present claim, we turn first to the relevant statutory provisions. Under sections 990 et seq. and 1010 et seq. of the Evidence Code, a patient enjoys a privilege to refuse to disclose any "confidential communication" between himself and a treating physician or psychotherapist, and sections 992 and 1012 make clear that these privileges extend to at least a significant portion of the medical histories sought to be discovered by defendant.[7] Sections 996 and 1016, however, establish an important exception to the general physician-

---

[5]On the basis of the constitutional analysis reviewed above, we conclude that the recent case of *Bakman* v. *Superior Court* (1976) 63 Cal.App.3d 306 [133 Cal.Rptr. 703], which upheld the validity of a discovery order analogous to that at issue in the instant case, was incorrectly decided and should be disapproved.

[6]Plaintiffs state that in response to other interrogatories they have specifically identified the particular ailments for which they seek recovery and have disclosed all requested medical information pertaining to such ailments.

[7]Section 992 provides in relevant part: "As used in this article, 'confidential communication between patient and physician' means information, including information obtained by an examination of the patient, transmitted between a patient and his physician in the course of that relationship . . . and includes a diagnosis made and the advice given by the physician in the course of that relationship." Section 1012 parallels

patient and psychotherapist-patient privileges, the "patient-litigant" exception, providing in relevant part that "[t]here is no privilege . . . as to a communication relevant to an issue concerning the condition of the patient if such issue has been tendered by . . . [t]he patient."[8] The resolution of the instant case turns on the proper interpretation of the scope of these statutory exceptions.

As we have already briefly indicated, our court addressed this identical question in *In re Lifschutz, supra,* 2 Cal.3d 415. The defendant in *Lifschutz,* like the defendant in the present case, asserted that under the patient-litigant exception as construed in earlier cases, a patient, by instituting a claim for physical or mental injury, automatically waived his statutory privilege as to *all* protected communications. In *Lifschutz,* however, we emphatically rejected such a broad rendition of the statutory exception. Noting that such an expansive construction "might effectively deter many . . . patients from instituting [legitimate lawsuits] out of fear of opening up all past communications to discovery," we concluded that such a "result would clearly be an intolerable and overbroad intrusion into the patient's privacy, not sufficiently limited to the legitimate state interest embodied in the provision, and would create opportunities for harassment and blackmail." (2 Cal.3d at p. 435.)

Accordingly, we held in *Lifschutz* that "the 'automatic' waiver of privilege contemplated by [the patient-litigant exception] must be construed not as a complete waiver of the privilege but only as a limited waiver concomitant with the purposes of the exception. Under section 1016 disclosure can be compelled only with respect to *those mental conditions* the patient-litigant has 'disclose[d] . . . by bringing an action in which *they* are in issue' [citation]; communications which are not directly

---

this language, substituting "psychotherapist" for "physician."

The bulk of the information sought by defendant—including (1) the "nature" of the injury or illness for which medical attention was sought (evidently as revealed by medical diagnosis), (2) the fact of professional treatment for mental illness or emotional or psychological disturbances, and (3) the prescribed medication that plaintiffs utilized—clearly falls within the aegis of these statutory privileges. Under these circumstances, we need not, and do not, determine with precision which portion of the requested information is privileged and which is not, for in any event the discovery authorized by the challenged order is clearly overbroad. On remand, defendant will bear responsibility for framing narrower, more precisely tailored interrogatories which do not improperly impinge on privileged information.

[8]The quoted language is from section 996. Section 1016 provides in virtually identical language that "[t]here is no privilege under this article as to a communication relevant to an issue concerning the mental or emotional condition of the patient if such issue has been tendered by . . . [t]he patient. . . ."

relevant to those specific conditions do not fall within the terms of section 1016's exception and therefore remain privileged. Disclosure cannot be compelled with respect to other aspects of the patient-litigant's personality even though they may, in some sense, be 'relevant' to the substantive issues of litigation. The patient thus is not obligated to sacrifice all privacy to seek redress for a specific mental or emotional injury; *the scope of the inquiry permitted depends upon the nature of the injuries which the patient-litigant himself has brought before the court.*" (Final italics added; remaining italics in original.) (2 Cal.3d at p. 435.) In *Roberts* v. *Superior Court* (1973) 9 Cal.3d 330, 337-339 [107 Cal.Rptr. 309, 508 P.2d 309], our court explicitly reaffirmed *Lifschutz*'s narrow interpretation of the scope of the patient-litigant exception.

Our holdings in *Lifschutz* and *Roberts* support plaintiffs' contention that the discovery order in the instant case is impermissibly overbroad. As *Lifschutz* explains, plaintiffs are "not obligated to sacrifice all privacy to seek redress for a specific [physical,] mental or emotional injury"; while they may not withhold information which relates to any physical or mental condition which they have put in issue by bringing this lawsuit,[9] they are entitled to retain the confidentiality of all unrelated medical or psychotherapeutic treatment they may have undergone in the past. The trial court thus obviously erred in ordering plaintiffs to disclose to defendant their entire lifetime medical histories and this aspect of the challenged discovery order must also be vacated.

### 4. Conclusion.

Our decision in the present case breaks no new constitutional ground. As we have explained, it has been clear for over two decades that the First Amendment provides substantial protection of an individual's interest in associational privacy and that it places severe restrictions on state-compelled disclosure of private affiliations and activities. The present decision simply recognizes that these firmly established constitutional precepts cannot be ignored merely because the issue of compelled disclosure arises in the context of litigation discovery; in this realm, as in all others, such disclosure of confidential associational affiliations and

---

[9]It should be understood, of course, that insofar as a number of injuries or illnesses, some related and some unrelated to the airport operations, have contributed to a medical condition placed in issue by a plaintiff, defendant is entitled to obtain information as to all such injuries or illnesses. Thus, for example, if a plaintiff claims that the airport operations have damaged his respiratory system, plaintiff would be obliged to disclose all medical information relating to his respiratory condition and could not limit discovery simply to those airport-related incidents which have allegedly impaired his condition.

activities must be justified by a compelling state interest and must be precisely tailored to avoid undue infringement of constitutional rights.

In an age when we must increasingly rely upon government intervention to meet the problems of society, the constitutional protections of the channels of protest become more crucial than ever before. In such a time the unlimited intrusion of governmental agencies into private associational activities must not be permitted to dry up the wholesome sources of dissent.

The wide-ranging discovery sanctioned in the instant case demonstrates quite unmistakably that the trial court was not sufficiently sensitive to these constitutional concerns. Accordingly, the challenged discovery order cannot stand.

Let a peremptory writ of mandate issue, directing the court (1) to vacate its discovery order with respect to defendant's inquiries into plaintiffs' private associational affiliations and activities and plaintiffs' lifetime medical histories and (2) to proceed in accordance with the views expressed herein.

Bird, C. J., Mosk, J., and Newman, J., concurred.

**RICHARDSON, J.**—I respectfully dissent, and conclude that discovery should be permitted in both of the principal areas sought by defendant public entity.

I amplify somewhat on the factual recitation of the majority. Plaintiffs are 936 property owners and occupants of land contiguous to, or situated near, Lindbergh Field in San Diego. They have sued a public agency, San Diego Unified Port District, which operates the field, for "not less than" $9,360,000. The gravamen of the complaint, contained in 11 counts and urging 6 theories of recovery, is that because of the use of Lindbergh Field by jet aircraft, and the attendant noise, smoke and fumes, plaintiffs have suffered property loss and severe personal injuries, physical and mental, which have impaired plaintiffs' ability to work or function in a normal manner. "As to each plaintiff the claimed damages for personal injuries are not less than $10,000 . . . ." It will thus be seen that the public agency faces very serious litigation involving multiple plaintiffs who allege very large losses for numerous and varied injuries.

In its answer the district has raised the defenses of the statute of limitations, the applicability of the 1-year and 100-day claims statutes (Gov. Code, § 911.2), the alleged failure of plaintiffs to mitigate their damages, and the issue of comparative negligence. (*Li* v. *Yellow Cab Co.* (1975) 13 Cal.3d 804 [119 Cal.Rptr. 858, 532 P.2d 1226, 78 A.L.R.3d 393].) To establish these defenses, the public agency commenced extensive discovery including service of notice to take depositions and to produce documents, as well as written interrogatories. Defendants sought to determine whether plaintiffs filed their action within the statutory limitations period which, by everyone's agreement, would have commenced at the time when, as to each plaintiff, operation of aircraft to and from Lindbergh Field "substantially interfered with the use and enjoyment of plaintiffs' properties." (*Ante,* p. 860, fn. 4, citing *Aaron* v. *City of Los Angeles* (1974) 40 Cal.App.3d 471, 492 [115 Cal.Rptr. 162].) To that end, both in depositions and by written interrogatories, defendant asked certain plaintiffs a series of questions bearing on the issue of the commencement of the limitations period, which questions plaintiffs have refused to answer. Further, by written interrogatories defendant sought, in a second area relating to damages, to explore the medical histories of the various plaintiffs to ascertain whether and to what extent the claimed shock and injury to the nervous system, emotional upset, irritability, and loss of hearing may have been caused by historical origins other than plaintiffs' exposure to Lindbergh Field. Initially, some of plaintiffs responded fully to defendant's inquiries, but succeeding plaintiffs refused to answer, thereby triggering notices of motion by defendant to compel answers, notices of motion by plaintiffs for protective orders, and the present proceeding.

Plaintiffs make two objections to the district's attempted discovery. First, as to those questions seeking to elicit information concerning meetings of persons at which the impact of Lindbergh Field may have been discussed, the plaintiffs assert that inquiry as to their associational activity violates plaintiffs' First Amendment rights, and second, that the scope of questions as to their medical history is harassing and constitutes an abuse of the discovery process. After reviewing two broad principles of California discovery law, I examine, in sequence, these contentions and the majority's analysis thereof.

Initially, I note that the majority, inexplicably, has either forgotten or has chosen to ignore what I had always considered to be our most definitive expression in the area of civil discovery. In 1961 through the careful analysis of Justice Peters, in *Greyhound Corp.* v. *Superior Court*

(1961) 56 Cal.2d 355 [15 Cal.Rptr. 90, 364 P.2d 266], we examined in very considerable depth the Discovery Act of 1957 (Code Civ. Proc., § 2016 et seq.). Under 79 headnotes we expressed the expansive views of this court on the legislative intent behind the act, compared new and old law, considered the nature of the trial court's discretion, conducted a careful procedural review and scrutinized many matters related to discovery generally.

In the 20 years since adoption of the act *Greyhound* has been considered by bench and bar as a prime authority in the interpretation of the act and the principles and policies on discovery matters. In considering the trial court's function we noted in relevant part: "It is apparent, however, that each exercise of discretion will occur under a differing set of facts, and that each case must, of necessity, be decided in light of those particular facts. But it is possible to lay down certain general rules based upon the nature and purpose of the discovery statutes which can be used in determining the proper exercise of discretion in all discovery cases. To constitute a proper exercise of discretion, the factual determination of the trial court should clearly and unequivocally be based upon the following legal concepts: [¶] 1. The legislative purposes [to give greater assistance to the parties *in ascertaining the truth* and checking and preventing perjury; provide an effective means of detecting and exposing false, fraudulent and sham claims and defenses; make available in a simple, convenient and inexpensive way, facts which otherwise could not be proved except with great difficulty; expedite litigation; simplify and narrow the issues; and expedite and facilitate both preparation and trial] are not to be subverted under the guise of the exercise of discretion; [¶] 2. *Those purposes are to be given effect rather than thwarted, to the end that discovery is encouraged*; . . ." (Pp. 382-383, italics added.)

Faithful to the foregoing overriding principles of *Greyhound,* we have consistently applied a liberal construction to the provisions of the act, permitting discovery and, while accepting the existence of privileges, have followed the strictures of Code of Civil Procedure section 2016, subdivision (b), wherein the Legislature has authorized discovery by deposition ". . . if the testimony sought appears *reasonably calculated to lead to the discovery of admissible evidence.*" On the issue of relevance, we were led to conclude in *Pacific Tel. & Tel. Co.* v. *Superior Court* (1970) 2 Cal.3d 161 [84 Cal.Rptr. 718, 465 P.2d 854], that ". . . the relevance of the subject matter standard must be reasonably applied; in accordance with the *liberal* policies underlying the discovery procedures, *doubts* as to

relevance *should generally be resolved in favor of permitting discovery."* (P. 173, italics added.) Bearing in mind the foregoing established procedural guidelines, I examine plaintiffs' two principal contentions.

### The Associational Activities

The majority has accepted plaintiffs' argument that compelled disclosure of meetings concerned with noise pollution from Lindbergh Field would violate their right of freedom of association, resulting in a "chilling effect" on individuals causing them to avoid such group participation. The premise is speculative and unconvincing.

*All* public displays of opinion or affiliation expose the participant to some degree of possible identification with a particular cause or concern. One who attends a meeting accepts the prospect that he will be seen, if only by others in attendance, with the possibility, indeed probability, that those in attendance will discuss with others the subject matter of the meeting and the identity of those who were present. I respectfully suggest that it would be an absurd extension of the concept of freedom of association to insist that such a hypothetical participant could require every other person present at the meeting to remain silent regarding either the nature of the meeting or the identification of those present lest someone's constitutional right of association be thereby infringed. A rule of reason must apply. The protection of association has never been equated with an absolute guarantee of anonymity.

Because it seems to me clear that plaintiffs or others present at the meetings in question could, in their own discretion, voluntarily have revealed the topics of the meetings and the names of the participants without offending any common sense notion of the bounds of privacy, the question before us then becomes whether state action in the form of a discovery order reaching the same information is an impermissible First Amendment violation. I think not. As a practical matter, an individual is no more likely to be dissuaded from associational activities because his participation is revealed through compliance with a discovery order than through the voluntary disclosure by a coparticipant.

At this point, and with due deference, I suggest that the majority seriously errs in its very heavy reliance upon *N. A. A. C. P.* v. *Alabama* (1958) 357 U.S. 449 [2 L.Ed.2d 1488, 78 S.Ct. 1163]. *NAACP* lends no support whatever for the extreme position taken by the majority herein. It is clearly distinguishable. In *NAACP* the Supreme Court held,

"Inviolability of privacy in group association *may in many circumstances* be indispensible to preservation of freedom of association, particularly where a group espouses dissident beliefs." (P. 462 [2 L.Ed.2d pp. 1499-1500], italics added.) The high court stressed that "Petitioner has made an *uncontroverted* showing that on past occasions revelation of the identity of its rank-and-file members has exposed these members to . . . *loss of employment, threat of physical coercion, and other manifestations of public hostility. Under these circumstances,* we think it apparent that compelled disclosure of petitioner's Alabama membership is likely to affect adversely the ability of petitioner and its members to pursue their collective effort to foster beliefs which they admittedly have the right to advocate . . . ." (*Ibid.,* italics added.)

Lacking any precedent, by sheer force of will the majority has deliberately expanded *NAACP* to a general abstract principle that the disclosure of *any* information about associational activities constitutes an impermissible violation of the right to associate. Nothing in *NAACP* either mandates or authorizes such an extreme reading. *NAACP* closely tied the denial of disclosure to the particular and unique situation which clearly and unmistakably indicated that harassment would follow disclosure. In stark contrast, in the matter before us defendant public agency is not accused of having harassed anyone. Absolutely no showing, controverted or otherwise, has been made that in the past any economic reprisal or physical coercion or loss of employment has been directed individually or collectively against any members of the citizens' groups to which plaintiffs belong. The underlying political considerations which motivated the actions of the State of Alabama are totally lacking in the matter before us. It is an altogether different case.

Unlike *NAACP,* the case presented to us involves no entity, private or public, blindly and illegally engaging in an historic racial vendetta, but rather a public body which must defend itself and its taxpayers against a multi-million dollar lawsuit for claimed injuries brought by hundreds of individuals. The district is not seeking in any manner to use its power as a state agency to regulate or censor plaintiffs' associational activities. It is a distortion to attempt to transform this case into some form of attempted "thought control" or censorship, for the record does not support any such inference, direct or remote. Defendant's interrogatories were directed exclusively to discovery of membership in *"organizations opposed to the way in which the Port District operates its airport."* Defendant is neither concerned with, nor does it seek to ascertain, plaintiffs' political, social, economic, or religious beliefs or the lack

thereof. It has no interest whatever in plaintiffs' membership in particular organizations, except only insofar as such affiliation may establish that plaintiffs are barred from recovery in this civil suit because they neglected to file their action within the statutory period, or, possessing early and adequate notice of the condition complained of, failed to mitigate their damages, or conducted themselves in a manner that was contributorily negligent.

It seems readily apparent that the information sought was relevant. The date or dates on which individual plaintiff's causes of action for personal injuries and property damage arose, bore directly on the commencement of the applicable statutes of limitations. The nature of the subjects discussed at associational meetings pertaining to claims against the airport all relate very directly to the issues of the statute of limitations and the defense of mitigation of plaintiffs' damages. If, for example, the district is able to establish through attending witnesses that a particular plaintiff, at meetings 10 years before the action was filed, stated in strong terms that his residence was rendered almost uninhabitable because of airport noise, can it be contended that such expressions would not be relevant and probative on the issue of when his limitations period commenced? Similarly, if the district is able to prove that at a meeting another plaintiff had expressed his great distress at fumes generated by the airport, but nonetheless had elected to purchase a new home somewhat closer to Lindbergh Field, can it seriously be urged that such testimony would not be relevant and probative on the issue of mitigation of damages? These areas of inquiry in my opinion are altogether proper.

What defendant is plainly attempting to do is to discover the identity of witnesses who may support its position that the claims of certain plaintiffs are barred by limitation of actions or that other plaintiffs have failed to mitigate their damages or have themselves been negligent. In failing to perceive this, in mandating the exclusion of *all* inquiry into *any* of the plaintiffs' associational activities vis-a-vis the airport, the majority, with all due respect, has indulged in a graphic example of judicial overkill.

The district has not only the *right,* but the affirmative *duty* to its taxpayers in defending this litigation to assert vigorously every defense available to it. If the disclosure of information might have some conceivably deterrent effect on plaintiffs' right of freedom of association, such effect is minimal and, under the facts presented to us, such an effect

is outweighed substantially by defendant's interest in preparing and presenting its defense. It was plaintiffs who brought the suit, alleged the injuries, opened the issues, imposed upon defendant the need for defenses, and thereby surely invited reasonable inquiry directed at the temporal and mitigating elements in the case. Fundamental fairness to opposing litigants requires that in the preparation and presentation of its available defenses the defendant not be required to face an "off-limits" sign where neither constitutional nor policy reasons require it. Nothing whatever in *N. A. A. C. P.* v. *Alabama, supra,* compels such a result.

Although we had previously denied a hearing in *Bakman* v. *Superior Court* (1976) 63 Cal.App.3d 306 [133 Cal.Rptr. 703], which had upheld the propriety of a discovery order almost identical to that at issue in the present case, the majority now disapproves it. In *Bakman,* the court observed, "It is patent that by bringing the lawsuit, petitioners voluntarily subjected themselves to the judicial process, and discovery procedures are an inherent part of that process. In fact, to hold that petitioners can resort to the judicial process in the form of bringing a suit for damages seeking redress against real party for alleged wrongs it committed against them, and at the same time—without a showing of detriment of any kind—absolutely shield *themselves* from the city's legitimate utilization would distort the salutary basis upon which the First Amendment right of freedom of association is grounded." (Pp. 314-315, italics in original.) Such a conclusion is sound. There is no logical basis on which to distinguish *Bakman,* which was correctly decided, and our denial of hearing therein was proper.

### The Medical Histories

Plaintiffs object to a trial court order, claiming that it is harassing and abusive, because it required them to list the dates and nature of their prior physical injuries and the nature and duration of treatment received for emotional disturbances. In my opinion the trial court acted well within its discretion and in accordance with correct discovery practice in ordering such disclosure.

It must be noted that the order in question did not require plaintiffs to furnish *any* medical records or physicians' reports. Rather, they are ordered only to provide defendant with a description of prior physical injuries for which medical treatment was received along with a general description of each incident, the nature and duration of treatment therefor, and the nature and duration of any treatment for mental or

emotional injury or illness. Such a discovery order, given plaintiffs' general allegations of injuries, cannot be fairly described as "harassing."

The information defendant seeks is directly relevant to its defense. As previously noted, plaintiffs' claims of injury are broad and sweeping, as shown by their allegations that as a result of airport noise plaintiffs have been "injured in their health, strength, and activity, have sustained bodily injuries and shock and injury to the nervous system, emotional upset, irritability and loss of hearing, all of which causes physical and mental pain and suffering" and which impairs plaintiffs' work and functioning. The complaint, now in its third amended form, does not, of course, specifically identify the precise nature of the mental or physical injury sustained by each of the 936 plaintiffs. This is not a class action. The very generality of the claimed injuries underscores the primary importance of discovery in seeking to ascertain the degree, if any, to which particular plaintiffs' alleged mental and physical injuries can properly be attributed to causes other than the noise, smoke, and fumes generated at Lindbergh Field.

The majority, in considering the request for medical histories, commits a serious analytical error. It characterizes sections 990 and following, and 1010 and following, of the Evidence Code, relating to the physician- and psychotherapist-patient relationship, as the "relevant statutory provisions." Noting the existence of a privilege of confidentiality in communications with the patient extending to medical histories and that sections 996 and 1016 constitute exceptions, the majority concludes that "The resolution of the instant case turns on the proper interpretation of the scope of these statutory exceptions." (*Ante,* p. 863.) However, both sections 996 and 1016 are concerned with privileged "communication," a term which is specifically defined in sections 992 and 1012 as "information, including information obtained by an examination of the patient, *transmitted between a patient and a physician* [or psychotherapist] in the course of that relationship . . . ." (Italics added.) A cursory examination of the interrogatories in question (see *ante,* p. 850) quickly discloses that much of the information requested, such as the mere fact of the existence of prior injury or medical treatment, cannot be deemed "communication" in any form within the definition of the cited sections.

The majority's conclusion that none of the requested information is the proper object of discovery appears to ignore the basic legal concept, set forth in *Greyhound* v. *Superior Court, supra,* that "The trial courts in exercising their discretion should keep in mind that the Legislature has

suggested that, where possible, the courts should impose *partial* limitations rather than *outright denial* of discovery; . . ." (56 Cal.2d at p. 383, italics added.) The majority would have demonstrated greater adherence to this principle by directing the trial court to review the interrogatories with a view to a possible limitation, given the claim of privileged communication, rather than by denial of discovery altogether.

Having laid a shaky statutory foundation, the majority constructs its argument from carefully selected quotations contained in cases which, on close inspection, underscore the weakness of the majority theses. Heavy reliance is placed, for example, on our expressions in *In re Lifschutz* (1970) 2 Cal.3d 415 [85 Cal.Rptr. 829, 467 P.2d 557, 44 A.L.R.3d 1], and *Roberts* v. *Superior Court* (1973) 9 Cal.3d 330 [107 Cal.Rptr. 309, 508 P.2d 309]. I suggest that neither case supports the majority's conclusion that the requested material was either privileged or irrelevant and therefore not discoverable. In *Lifschutz* we dealt with a substantially similar issue and our holding seems to me to be entirely contrary to the position urged by the majority. In that action for damages from an alleged assault, a psychiatrist was imprisoned for contempt for refusing to obey an order of the trial court which had instructed him to answer deposition questions and to produce records relating to communications with a former patient. The complaint alleged physical injuries, pain and suffering, and severe emotional distress. During the course of his deposition plaintiff admitted that he had received treatment from psychiatrist Lifschutz approximately 10 years earlier.

The majority's lengthy quotation from *Lifschutz* serves only to reaffirm a point not in dispute, namely, that "the scope of the inquiry permitted depends upon the nature of the injuries which the patient-litigant himself has brought before the court." (2 Cal.3d at p. 435.) Had the majority elected, however, to extend the quotation it would have reaffirmed our expression which has much greater significance to the matter before us, for we immediately continued, "In some situations, the patient's pleadings may clearly demonstrate that *his entire mental condition is being placed in issue and that records of past psychotherapy will clearly be relevant.*" (*Ibid.,* italics added.) We further noted: "In other cases, however, the determination of the specific 'mental condition' in issue may present more complex problems. The difficulties involved in analyzing the applicability of the exception in the instant case may be illustrative. The plaintiff's complaint, containing *the typical allegations of 'mental and emotional distress'* arising out of a physical assault, does not specifically identify the nature of the 'mental or emotional condition' at

issue . . . . *The generality of the claim . . . does create the possibility that some feature of plaintiff's psychological history will be directly relevant to the determination of whether his emotional or mental distress can be properly attributed to the alleged assault . . . .*[W]e cannot determine from the present state of the record whether plaintiff's 'mental and emotional' distress is merely the 'normal' distress experienced as a result of physical assault or whether it includes unusual or particularly serious elements upon which prior history may be directly relevant." (P. 436, italics added.) As noted, in our instant case plaintiffs allege "shock and injury to the *nervous system, emotional upset, irritability* . . . which causes mental pain and suffering."

The majority ignores the true and clear analogy between *Lifschutz* and the instant case. With more than 900 plaintiffs making complaints which reflect a wide variety of mental and physical conditions, it is impossible for us to determine from the state of the record whether and to what extent the prior history of any particular plaintiff could or could not lead to the discovery of evidence relevant to his complaint. Acknowledging that the evidence may have contained relevant material, in *Lifschutz* we held that the petitioner-psychiatrist had *no right* to refuse to produce the records in question even though the records were 10 years old. Furthermore, we held that ". . . the burden rests upon the patient initially to submit some showing that a given confidential communication is not directly related to the issue he has tendered to the court." (*Ibid.*)

Plaintiffs have declined to delimit the areas of emotional and physical injury for which they seek recovery. Rather, they make only the most generalized assertions in this regard. Surely, in fairness, defendant is entitled to attempt to show in this civil action that there were independent causes, other than airport noise, for any emotional and physical conditions of which plaintiffs complain. It is self-evident that the human body is an integrated system; various conditions and injuries are not capable of being neatly categorized and catalogued into clearly separable functions and conditions by medical experts; there is a physiological interrelationship. This is particularly true in an area so fraught with uncertain etiology as "emotional upset" and "mental pain and suffering." The defendant should be permitted to develop facts, if it is able to do so, showing that some or all of the injuries claimed by plaintiffs in fact resulted from sources other than the airport. The interrogatories objected to by plaintiffs are the first logical step in accomplishing that objective.

In *Roberts* v. *Superior Court, supra,* 9 Cal.3d 330, we reaffirmed *Lifschutz'* narrow interpretation of the scope of the patient-physician exception, but nothing that we said in *Roberts* supports plaintiffs' contention that the discovery order in the instant case is impermissibly overbroad. Plaintiff in *Roberts* claimed *no damages for emotional distress or mental suffering.* She sought only redress for pain in her neck, back, and legs. She had been asked questions concerning, and had described, previous illnesses and institutional confinement. She had, in fact, delivered to defendant various reports of the physicians who had treated her both before and after the collision from which the suit arose. Plaintiff objected to discovery only when defendants subpoenaed *all* of her medical records in the custody of the various physicians who had treated her, including those of her psychotherapist.

In *Roberts,* holding that the requested discovery exceeded permissible boundaries, we noted, "A fortiori, in a case such as this where there is *no specific mental condition of the patient at issue,* and discovery of the privileged communications is sought merely upon speculation that there may be a 'connection' between the patient's past psychiatric treatment and some 'mental component' of his present injury, those communications should remain protected by the privilege of section 1014." (*Id.,* at p. 339, italics added.) In sharp contrast, as I have noted, the present plaintiffs have made a *specific* complaint that the noise level at the airport caused them to suffer *emotional distress.* Plaintiffs have placed the subject in issue and, unlike *Roberts,* the inquiries of defendant as to the mere fact of past medical treatments of plaintiffs are thus directly relevant to a specific mental condition voluntarily and expressly raised in the present litigation and initiated by plaintiffs.

It will be observed that discovery in this matter, a massive undertaking at best, can occur in one of two ways: Defendant can conduct oral depositions of the 936 plaintiffs. If three depositions a day are conducted five days per week, approximately one year and two months will be consumed. Doubtless the cost on either side will be extremely high. The alternative is through use of written interrogatories, attempting thereby to identify the more serious claims and to focus on them. This apparently is what defendant seeks, and it should be permitted to do so.

The majority's statutory and legal analysis fails to survive close scrutiny. However, my concern with the majority's misreading of precedent is overshadowed by what I view as its substantial reassignment of roles in the matter of pretrial discovery. I had thought it generally

accepted that the tasks of determining what material is discoverable, what is relevant, and what is privileged, were primarily functions of the trial court. The majority, unaccountably, has determined that this duty can best be discharged by *plaintiffs* themselves.

The majority commends plaintiffs because "they are completely willing to provide defendant with medical information which *relates* in any way to the physical or emotional injuries for which they seek recovery." (*Ante,* p. 862 italics added.) But the vital, unanswered question is, who decides what information "relates" to the claimed injuries? The majority concludes that "[t]he trial court thus obviously erred in ordering plaintiffs to disclose to defendant their entire lifetime medical histories" (*ante,* p. 864), and that plaintiffs "are entitled to retain the confidentiality of all *unrelated* medical or psychotherapeutic treatment they may have undergone in the past." (*Ibid.,* italics added.) It is clear that the majority intends that the plaintiffs are to determine what is "unrelated." The majority fails to comment, as we did in *Lifschutz,* on the obvious important relationship between plaintiffs' medical history and their present health. This is most strange. The majority's formulation permits plaintiffs to serve as their own medical experts, picking and choosing between various injuries and diseases and deciding for themselves which are, or are not, relevant to the injuries which they presently claim. A particular plaintiff thereby becomes his own judge, thus depriving defendant of any opportunity to contest plaintiffs' determination of relevancy. Such a result is unthinkable, for it contravenes every sound principle of fair and open discovery. It permits a plaintiff carefully, selectively, and conveniently to draw a curtain around those portions of his medical background which he elects not to disclose. Moreover, medical histories have their primary value and significance when subjected to *medical* not *lay* evaluation and review. An injury or disease which, to a litigant, may seem wholly irrelevant, may be clinically significant to a physician. The power to determine relevance in the discovery area should remain where it properly has been, with the trial court empowered to issue the discovery orders.

If in the proper pursuit of relevant probative evidence defendant's inquiries constitute harassment, Code of Civil Procedure section 2019, subdivision (b)(1), offers a remedy. It permits the court to "make any other order which justice requires to protect the party or witness from annoyance, embarassment or oppression." As we noted in *Lifschutz,* when "inquiry into the confidential relationship takes place before trial during discovery . . . the patient . . . may apply to the trial court for a

protective order to limit the scope of the inquiry or to regulate the procedure of the inquiry so as to best preserve the rights of the patient." (2 Cal.3d at p. 437.) The availability of these protective orders remains as security against abuse.

In *Bakman* v. *Superior Court, supra,* 63 Cal.App.3d 306, the court observed that, "The issue narrows to whether real party's statutory right to pursue legitimate discovery procedures and the state's compelling interest in the enforcement of such procedures outweighs the deterring effect the disclosure sought has upon the First Amendment right to freedom of association of the persons whose identities real party is seeking to discover, so that it can be said, fairly, that *under the facts of this case* the qualified constitutional privilege must yield to a more compelling state purpose. We have concluded that the answer to this question is in the affirmative." (P. 315, italics in original.)

In the matter before us the requested medical histories were not privileged information and were clearly relevant to the defense which defendant sought to prepare and establish. The request for such discovery was a reasonable and necessary request, and the trial court acted properly within its discretion in permitting such discovery.

As with the unanimous Courts of Appeal, both in *Bakman* and herein, I would affirm the trial court's order of discovery.

Clark, J., and Manuel, J., concurred.