[No. A049863. First Dist., Div. Five. July 10, 1991.]

PACIFIC-UNION CLUB, Petitioner, v.
THE SUPERIOR COURT OF SAN FRANCISCO COUNTY, Respondent;
STATE FRANCHISE TAX BOARD, Real Party in Interest.

[No. A049416. First Dist., Div. Five. July 10, 1991.]

STATE FRANCHISE TAX BOARD, Plaintiff and Respondent, v.
PACIFIC-UNION CLUB, Defendant and Appellant.

COUNSEL

Pillsbury, Madison & Sutro, William I. Edlund, Walter R. Allan, Dennis K. Bromley and Craig E. Stewart for Petitioner and for Defendant and Appellant.

No appearance for Respondent Superior Court.

John K. Van de Kamp and Daniel E. Lungren, Attorneys General, Richard F. Finn and Julian O. Standen, Deputy Attorneys General, for Real Party in Interest and for Plaintiff and Respondent.

OPINION

LOW, P. J.—Discrimination based on characteristics such as race, sex, age, and religion is repugnant in any form. Nevertheless, purely private clubs are free to engage in such discrimination. However, members of private discriminatory clubs may not deduct club-related business expenses on their state income tax returns. The Franchise Tax Board seeks disclosure of a private club's membership list in order to test for compliance with the ban on deductions. This raises a sensitive issue of First Amendment associational privacy. To retain its vitality the First Amendment must protect the ideas society condemns as well as those it embraces. In this case we must therefore prevent disclosure to the government of a membership list of a private social club.

The Pacific-Union Club (the Club) seeks a writ of mandate to compel respondent superior court to vacate its order enforcing an administrative subpoena duces tecum (Gov. Code, §§ 11187, 11188) issued by real party Franchise Tax Board (the Board). The Club is a private club which concededly engages in discriminatory practices. The Board subpoenaed the Club's membership list to determine whether any members had violated a tax regulation banning business deductions for private clubs which discriminate. The Club contends enforcement of the subpoena would violate the First Amendment associational privacy rights of its members, because the Board has not shown a compelling state interest for disclosure. Given the Board's

lack of grounds to believe that any Club member has violated the regulation, we are constrained to protect the right of associational privacy however much we disagree with the practice of discrimination. We issue the writ of mandate.

## I

The Club describes itself as a purely private social organization. Article I of the Club's constitution provides that the Club's exclusive purpose is "to promote social intercourse among its members." The Club maintains a restaurant and other club facilities, for the exclusive use of members and a limited number of guests, in the former Flood mansion atop San Francisco's Nob Hill. Club members are prohibited from conducting business on Club premises. Club members must certify that charges incurred for use of Club facilities, including meals, were not incurred in the furtherance of trade, business or a profession.

The Club is one of the most selective private clubs in California. Membership is restricted to 760 resident members who live in the Bay Area, 50 other California members, and 148 out-of-state members. The Club does not advertise or recruit new members, nor does it encourage expansion of its membership. The Club's membership list is strictly private and is not disclosed outside the Club. Club functions are also private; photography is generally prohibited and members and guests are prevented from describing Club functions to the media.

The rules for admission provide for a deliberate, gradualistic process for qualification as a new member, with a waiting period of up to 12 months. The admissions process includes the distribution of questionnaires to the candidate's sponsors, plus numerous personal interviews. Throughout the several stages of the process the candidate is continuously and subjectively evaluated for the degree of congeniality and compatibility with existing members. Membership is ultimately decided by a secret ballot, at which only two negative votes defeat the application. The Club describes this process as "arduous" and as "one of the most highly selective in the country."

The Club's admissions process is also discriminatory. In negotiations with the Board, in the superior court proceedings, and in this court, the Club conceded that it discriminates on the basis of age by requiring all prospective members to be at least 25. The Club is also widely reputed among residents of the San Francisco Bay Area to discriminate against women, and to permit

only males to assume membership. The Board represented below that the subpoena was issued on the basis of "uncontroverted evidence that the Club discriminates against women." The only evidence of sex discrimination introduced in the trial court, however, was the Club's corporation exemption tax application, dated June 11, 1952, which defines its membership qualifications as "[a]ny male over 25 years of age approved by the current members." While the Club's reputation for sex discrimination is a widely held belief, this court is limited to record evidence. This 40-year-old document is the only record evidence of present sex discrimination.

The Board promulgated section 17201 of title 18, California Code of Regulations, relating to the personal income tax law. Section 17201 provides in part that "[o]n and after January 1, 1988, business expense tax deductions will not be allowed with respect to payments to a club which restricts membership or the use of its . . . facilities on the basis of age, sex, race, religion, color, ancestry or national origin."[1] Because the regulation applies to the Club on the conceded ground of age discrimination, the accuracy of the Club's widespread reputation for sex discrimination need not be conclusively resolved for purposes of our analysis.

The Board issued an administrative subpoena duces tecum for the Club's membership list, seeking the names, addresses and Social Security numbers of all persons who were members of the Club at any time in 1988.[2] The subpoena's stated purpose was "to obtain records which the Franchise Tax Board requires to determine whether Pacific Union Club members have taken improper tax deductions on 1988 California tax returns with respect to expenses incurred at the Pacific Union Club." In previous informal negotiations Board representatives indicated that the membership list would be used to conduct random audits of individual Club members' state income tax returns, which would include, but not be limited to, the deduction of Club dues and expenses. The Board acknowledged that it had no evidence that any Club member took such deductions and that it did not expect to find much noncompliance with the regulation.

The Club had already informed its membership that the regulation applied and that business deductions for Club expenses were illegal. Since August

---

[1]At the same time, the Board promulgated an identical regulation, California Code of Regulations, title 18, section 24343, relating to the Bank and Corporation Tax Law. This second regulation is not at issue because the Club has no corporate members. Effective January 1, 1990, both regulations were superseded by statute. (Rev. & Tax. Code, §§ 17269, 24343.2.)

[2]The subpoena was authorized by Revenue and Taxation Code section 26423, subdivision (c), which provides that in the performance of its duties the Board "may issue subpoenas or subpoenas duces tecum . . . for any purpose."

1987 each member's monthly statement included a reminder that all Club expenses are to be paid from a member's personal funds and are not to be made in furtherance of a trade, business or profession. Since April 1, 1988, each monthly statement has included this instruction: "DUES ARE NOT DEDUCTIBLE AS CHARITABLE CONTRIBUTIONS. DUES & OTHER EXPENDITURES ARE NOT DEDUCTIBLE AS ORDINARY & NECESSARY BUSINESS EXPENSES FOR FEDERAL & CALIFORNIA STATE INCOME TAX OR FRANCHISE TAX PURPOSES."

The Club, citing its members' First Amendment right of associational privacy, resisted the subpoena. The Board petitioned the superior court for an order for its enforcement. (Gov. Code, §§ 11187, 11188.) Government Code section 11188 provides that if an administrative subpoena "was regularly issued" by the head of the pertinent administrative department, "the court shall enter an order" for its enforcement. The Board argued that the information sought was "relevant to an investigation currently being conducted by the Board to ensure compliance" with the tax regulation, and was thus regularly issued by the head of the Board.

At oral argument below the Board candidly admitted it had no information concerning any illegal deductions by members: "We [need] to determine the audit pool to find out whether or not any member of the Club has violated the regulations. It is the only way we have of determining who the members are . . . at this time we do not have any information—specific information about whether any specific member is in violation of the regulations."

The trial court granted the motion for enforcement of the order, and directed disclosure of the membership list. The court stayed its order pending the expected appellate challenge. This petition followed.[3]

---

[3]The Club also filed an appeal (A049416) because of some confusion whether an order enforcing an administrative subpoena is appealable or reviewable by extraordinary writ. Some cases assume appealability without discussion. (See, e.g., *Younger* v. *Jensen* (1980) 26 Cal.3d 397 [161 Cal.Rptr. 905, 605 P.2d 813]; *Board of Medical Quality Assurance* v. *Gherardini* (1979) 93 Cal.App.3d 669 [156 Cal.Rptr. 55]; *Fielder* v. *Berkeley Properties Co.* (1972) 23 Cal.App.3d 30 [99 Cal.Rptr. 791].) Other cases conclude that a Government Code section 11188 order is directly appealable as a final judgment in a special proceeding. (*Franchise Tax Board* v. *Barnhart* (1980) 105 Cal.App.3d 274, 277 [164 Cal.Rptr. 331]; see *Wood* v. *Superior Court* (1985) 166 Cal.App.3d 1138, 1140 [212 Cal.Rptr. 811].) Still others have concluded that such orders are reviewable only by writ. (*People* ex rel. *Franchise Tax Bd.* v. *Superior Court* (1985) 164 Cal.App.3d 526, 535 [210 Cal.Rptr. 695]; *Barnes* v. *Molino* (1980) 103 Cal.App.3d 46, 51 [162 Cal.Rptr. 786].) *Tom* v. *Schoolhouse Coins, Inc.* (1987) 191 Cal.App.3d 827 [236 Cal.Rptr. 541], noted the confusion in the law but determined the order was appealable simply because "the Supreme Court is among those courts appearing to

## II

■ The Board argues that this court may not examine the merits of the Club's privacy claim because article XIII, section 32 (hereafter section 32) of the California Constitution prevents any court from interfering with the Board's right to obtain taxpayer information. Section 32, the so called "anti-injunction provision," states: "No legal or equitable process shall issue in any proceeding in any court against this State or any officer thereof to prevent or enjoin the collection of any tax. After payment of a tax claimed to be illegal, an action may be maintained to recover the tax paid, with interest, in such manner as may be provided by the Legislature."

"The policy behind section 32 is to allow revenue collection to continue during litigation so that essential public services dependent on the funds are not unnecessarily interrupted. [Citation.]" (*Pacific Gas & Electric Co.* v. *State Bd. of Equalization* (1980) 27 Cal.3d 277, 283 [165 Cal.Rptr. 122, 611 P.2d 463].) Section 32 "means what it says" (*id.*, at p. 284), and bars not only suits for injunctive relief but those seeking declaratory relief or mandamus. (*Id.*, at pp. 280-281; *Calfarm Ins. Co.* v. *Deukmejian* (1989) 48 Cal.3d 805, 838 [258 Cal.Rptr. 161, 771 P.2d 1247].) It "broadly limits in the first instance the power of the courts to intervene in tax collection matters." (*Western Oil & Gas Assn.* v. *State Bd. of Equalization* (1987) 44 Cal.3d 208, 213 [242 Cal.Rptr. 334, 745 P.2d 1360].)

Section 32 applies not only to direct collection of a tax but to precollection taxing activities such as a demand by administrative subpoena for information pertinent to taxation. (44 Cal.3d at p. 213; *People* ex rel. *Franchise Tax Bd.* v. *Superior Court, supra*, 164 Cal.App.3d at pp. 544-545.) ■ "[T]he enforcement of a subpoena regularly issued and prosecuted by the [Board], in accordance with Revenue and Taxation Code section 19254 and Government Code sections 11180-11191, is a first step in the collection of a tax and an integral part of the tax collection process, and section 32 mandates that it shall not be prevented or enjoined by the legal or equitable process of any court." (164 Cal.App.3d at p. 545.)

---

assume the appealability" of Government Code section 11188 orders. (*Id.*, at pp. 828-829, fn. 1.)

In *Craib* v. *Bulmash* (1989) 49 Cal.3d 475 [261 Cal.Rptr. 686, 777 P.2d 1120], the Supreme Court declined to resolve the confusion. The Court of Appeal had discussed the appealability problem with citations to both sides of the debate. The Supreme Court opinion does not discuss the question of appealability.

We need not decide the question by engaging in a lengthy analysis of the various decisions. Even if the order is directly appealable, we would review the order by writ in this case in the interests of judicial economy and expediency. (See, e.g., *Barnes* v. *Molino, supra*, 103 Cal.App.3d at p. 51; *Branham* v. *State Farm Mut. Auto Ins. Co.* (1975) 48 Cal.App.3d 27, 32-33 [121 Cal.Rptr. 304].)

Accordingly, the appeal in No. A049416 is dismissed.

 Notwithstanding this and other absolutist language, including the Supreme Court's 1980 intimation that section 32 was a "seemingly absolute bar" (*Pacific Gas & Electric Co.* v. *State Bd. of Equalization, supra,* 27 Cal.3d at p. 280), the Supreme Court has made it clear that section 32 is not monolithic. "[L]imited judicial intervention is nonetheless permissible in some circumstances. The ban on prepayment judicial review found in the state Constitution must yield, of course, to the requirements of the federal Constitution [citation]." (*Western Oil & Gas Assn.* v. *State Bd. of Equalization, supra,* 44 Cal.3d at p. 213.) The supremacy of the federal Constitution is especially clear when taxing authorities demand or subpoena information: a court "has jurisdiction to determine whether the Board's inquiry offends the prohibition against unreasonable searches and seizures or violates the right of privacy or the privilege against self-incrimination. [Citation.]" (*Id.,* at p. 214; accord, *People* ex rel. Franchise Tax Bd. v. *Superior Court, supra,* 164 Cal.App.3d at p. 540.)

We thus conclude that we have jurisdiction to consider the merits of the Club's First Amendment associational privacy objection to the Board's subpoena.[4]

### III

 The privacy of personal association is protected by the First and Fourteenth Amendments of the United States Constitution. (*N.A.A.C.P.* v.

---

[4]Lest we appear to give this procedural issue short shrift, we note that we have thoroughly reviewed the extensive briefing of both sides and have pored through the detailed textual arguments presented. We are satisfied we have jurisdiction. The Board focuses on the use of the phrase "reasonable relevance" to describe the standard of judicial review, and contends the sought after information fits this standard. Regardless of certain language in *Western Oil,* the "reasonable relevance" standard of review does not foreclose the constitutional questions presented. This conclusion is consistent with other California administrative subpoena cases which note that the "reasonable relevance" standard predates, and must incorporate, the evolution of the modern recognition of the right of privacy. (*Board of Medical Quality Assurance* v. *Gherardini, supra,* 93 Cal.App.3d at pp. 676-677; see *Wood* v. *Superior Court, supra,* 166 Cal.App.3d at pp. 1146-1147.

Other language in *Western Oil* suggests that if the imposition of the tax has any conceivable validity in fact or law, courts must defer to the taxing authority and cannot review constitutional defenses to subpoenas. This language was clarified, and this interpretation rejected, in *Union Pacific R.R. Co.* v. *State Bd. of Equalization* (1989) 49 Cal.3d 138, 147 [260 Cal.Rptr. 565, 776 P.2d 267]).

Moreover, the federal antitax injunction decisions, to which the California Supreme Court looks for guidance (44 Cal.3d at p. 214), state generally that the federal analog to section 32 is " 'subject to the traditional privileges and limitations.' " (*United States* v. *Arthur Young & Co.* (1984) 465 U.S. 805, 816 [79 L.Ed.2d 826, 835, 104 S.Ct. 1495], quoting *United States* v. *Euge* (1980) 444 U.S. 707, 714 [63 L.Ed.2d 141, 149, 100 S.Ct. 874].) The United States Supreme Court has held that the federal analog is subject to the attorney-client privilege and the attorney work-product doctrine. (*Upjohn Co.* v. *United States* (1981) 449 U.S. 383, 386, 398 [66 L.Ed.2d 584, 589, 596-597, 101 S.Ct. 677]; see *Matter of Newton* (11th Cir. 1983) 718 F.2d 1015, 1021.)

*Alabama* (1958) 357 U.S. 449, 460-461 [2 L.Ed.2d 1488, 1498-1499, 78 S.Ct. 1163]; *Britt* v. *Superior Court* (1978) 20 Cal.3d 844, 852-853 [143 Cal.Rptr. 695, 574 P.2d 766].) The freedom to associate with the persons of one's choice, without unwarranted governmental intervention or interference, is divided into two components: the freedom of intimate association and the freedom of expressive association. (*Roberts* v. *United States Jaycees* (1984) 468 U.S. 609, 617-618 [82 L.Ed.2d 462, 470-472, 104 S.Ct. 3244].)
██ Intimate association stands constitutionally protected because "choices to enter into and maintain certain intimate human relationships must be secured against undue intrusion by the State because of the role of such relationships in safeguarding the individual freedom that is central to our constitutional scheme." (*Ibid.*) Thus, "freedom of [intimate] association receives protection as a fundamental element of personal liberty." (*Id.*, at p. 618 [82 L.Ed.2d at p. 471].)

██ Freedom of expressive association stands protected as an "indispensable means of preserving" the liberty to "associate for the purpose of engaging in those activities protected by the First Amendment—speech, assembly, petition for the redress of grievances, and the exercise of religion." (468 U.S. at p. 618 [82 L.Ed.2d at p. 471].) The freedom of expressive association enjoys a "close nexus" with the freedom of speech (*N.A.A.C.P.* v. *Alabama, supra*, 357 U.S. at p. 460 [2 L.Ed.2d at p. 1498]), and embodies a "right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends." (*Roberts* v. *United States Jaycees, supra*, 468 U.S. at p. 622 [82 L.Ed.2d at p. 474].)

Only the freedom of intimate association is pertinent to this case. The Club does not claim that it engages in any expressive activities protected by the First Amendment, such as the advocacy of social or political points of view. Indeed, the Club's sole stated purpose is to the promotion of friendship and camaraderie. Thus the Club, as a purely convivial organization, must ground its associational privacy claim in the soil of the freedom of intimate association.

██ In its own words, the Supreme Court "has long recognized that, because the Bill of Rights is designed to secure individual liberty, it must afford the formation and preservation of certain kinds of highly personal relationships a substantial measure of sanctuary from unjustified interference by the State. [Citations.] Without precisely identifying every consideration that may underlie this type of constitutional protection, we have noted that certain kinds of personal bonds have played a critical role in the culture and traditions of the Nation by cultivating and transmitting shared ideals and beliefs; they thereby foster diversity and act as critical buffers between the individual and the power of the State. [Citations.] Moreover, the

constitutional shelter afforded such relationships reflects the realization that individuals draw much of their emotional enrichment from close ties with others. Protecting these relationships from unwarranted state interference therefore safeguards the ability independently to define one's identity that is central to any concept of liberty. [Citations.]" (*Roberts* v. *United States Jaycees, supra,* 468 U.S. at pp. 618-619 [82 L.Ed.2d at pp. 471-472]; see *Bd. of Dirs. of Rotary Int'l* v. *Rotary Club* (1987) 481 U.S. 537, 545 [95 L.Ed.2d 474, 484, 107 S.Ct. 1940].)

The United States Supreme Court has described a qualitative continuum of personal relationships, from the most intimate to the most public and impersonal, from the associations most well defended by the freedom of association to those left outside the protective walls of the right of privacy. The most intimate personal relationships include marriage, childbirth, child rearing and education, and cohabitation with one's relatives. "Family relationships, by their nature, involve deep attachments and commitments to the necessarily few other individuals with whom one shares not only a special community of thoughts, experiences, and beliefs but also distinctively personal aspects of one's life." (*Roberts* v. *United States Jaycees, supra,* 468 U.S. at pp. 619-620 [82 L.Ed.2d at p. 472].) In the associational privacy context these relationships are "distinguished by such attributes as relative smallness, a high degree of selectivity in decisions to begin and maintain the affiliation, and seclusion from others in critical aspects of the relationship." (*Id.,* at p. 620 [82 L.Ed.2d at p. 472].) Such relationships are not limited to familial settings, however, and may be found in intimate contexts outside the family. (*Bd. of Dirs. of Rotary Int'l* v. *Rotary Club, supra,* 481 U.S. at p. 545 [95 L.Ed.2d at p. 484].)

At the opposite end of the privacy continuum are the interpersonal associations which lack these attributes, such as those found in the impersonal hierarchy of a large corporation or other business organization. These associations are "remote" from the privacy concerns giving rise to constitutional protection: "the Constitution undoubtedly imposes constraints on the State's power to control the selection of one's spouse that would not apply to regulations affecting the choice of one's fellow employees [citation]." (*Roberts* v. *United States Jaycees, supra,* 468 U.S. at p. 620 [82 L.Ed.2d at p. 473].) More pithily put, the freedom to associate protects admission to the boudoir but not to the bureaucracy.

Between these two opposite poles "lies a broad range of human relationships that may make greater or lesser claims to constitutional protection from particular incursions by the State." (468 U.S. at p. 620 [82 L.Ed.2d at p. 473].) At some point along the continuum, relationships lose that degree of intimacy sufficient to invoke constitutional protection and find themselves

too impersonal to be enfolded within the freedom of associational privacy. The United States Supreme Court has declined to map this middle ground with precise benchmarks. The evaluation of the degree of intimacy of a particular personal association "entails a careful assessment of where that relationship's objective characteristics locate it on a spectrum from the most intimate to the most attenuated of personal attachments. [Citation.]" (*Ibid.*) The factors pertinent to this assessment include "size, purpose, policies, selectivity, congeniality, and other characteristics that in a particular case may be pertinent." (*Ibid.*)

■ After review of these factors, we believe the Club is clearly a purely private social group which is entitled to the protection of the freedom of intimate association. Contrary to the Board's position, the Club is not similar to the Jaycees and Rotary organizations but is much farther toward the intimate pole of the associational spectrum. For one thing, the Club is substantially smaller in membership, organizational structure, and geographic focus. At the time of trial in the *Roberts* action, the Jaycees had approximately 295,000 national members in 7,400 local chapters affiliated with 51 state organizations. Policymaking authority was vested in a national convention of delegates from local chapters, with a national president and board of directors. (468 U.S. at p. 613 [82 L.Ed.2d at p. 468].) In *Rotary Club*, the local clubs ranged in size from 20 to 900 members, with no upper limit. (481 U.S. at p. 546 [95 L.Ed.2d at p. 485].) Their umbrella organization, Rotary International, had about 907,750 members at time of trial, and included 19,788 local clubs in 157 countries. (*Id.*, at pp. 539-540 [95 L.Ed.2d at pp. 480-481].) By contrast, the Club has a fixed membership, limited to 760 members who reside in the San Francisco Bay Area, 50 members living in the rest of California, and 148 members living out of the state. Although there is a brief reference in the record to a few national and international affiliates, the Club is part of no formal national organization and there is no umbrella group of which the Club is simply a local chapter.

The Jaycees recruited new members "actively" through a "variety of promotional activities." (468 U.S. at p. 613 [82 L.Ed.2d at p. 468].) The local Rotary Clubs "are instructed to 'keep a flow of [membership] prospects coming' to make up for [a 10% annual] attrition [rate] and gradually to enlarge the membership." (481 U.S. at p. 546 [95 L.Ed.2d at p. 485].) The Club does not advertise or recruit new members, and does not encourage expansion of its membership.

The Club is more intimate in terms of its purpose for existence, and therefore its degree of congeniality. The goal of the Jaycees is the pursuit of " 'such educational and charitable purposes as will promote and foster the growth and development of young men's civic organizations in the United

States, designed to inculcate in the individual membership of such organization a spirit of genuine Americanism and civic interest . . . and to develop true friendship and understanding among young men of all nations.' " (468 U.S. at pp. 612-613 [82 L.Ed.2d at p. 468].) The Rotary Clubs exist to " 'provide humanitarian service, encourage high ethical standards in all vocations, and help build goodwill and peace in the world.' " (481 U.S. at p. 539 [95 L.Ed.2d at p. 480].) The Jaycees and the Rotary Clubs are large organizations of national scope which include business development and community interaction among their activities. By contrast, the Club has no outwardly directed civic or community objectives and exists solely for the enjoyment of social intercourse among members carefully chosen for their congeniality and social compatibility. Moreover, the Club associates within the compact geographic area of the city of San Francisco. Referring to another "large and diverse" city, New York, Justice O'Connor has opined that "in such a large city a club with over 400 members may still be relatively intimate in nature" with respect to the freedom of association. (*New York State Club Ass'n* v. *New York City* (1988) 487 U.S. 1, 19 [101 L.Ed.2d 1, 20, 108 S.Ct. 2225] (conc. opn. of O'Connor, J.).)

In pursuit of its sole purpose of conviviality the Club is more selective than the Jaycees or Rotary Club. Jaycees membership is not selective. (468 U.S. at pp. 613, 621 [82 L.Ed.2d at pp. 468, 473-474].) "Apart from age and sex, neither the national organization nor the local chapters employ any criteria for judging applicants for membership, and new members are routinely recruited and admitted with no inquiry into their backgrounds." (*Id.*, at p. 621 [82 L.Ed.2d at p. 473].) (Indeed, a national membership in the six figures, coupled with active recruitment efforts, argues against selectivity in membership selection.) The same may be said about the Rotary Club. Those clubs do evaluate a prospective member's " 'character, business and social standing, and general eligibility,' " but Rotarians are instructed to have an inclusive, not exclusive, membership and to recruit all fully qualified members within the territory of a local club. The Supreme Court concluded that this lack of selectivity "do not suggest the kind of private or personal relationship" deserving First Amendment protection. (481 U.S. at p. 547 [95 L.Ed.2d at p. 485].) Again, an enormous national membership plus active recruitment does not suggest associations sufficiently selective to rise to the level of intimate personal relationships. By contrast, the Club's membership process is highly selective and involves a time-consuming evaluation of the proposed member's personality, compatibility and degree of successful assimilation into the collective conviviality of the membership.

This carefully enforced intimacy colors the policies of the Club regarding its relations with the world outside its confines. Both the Jaycees and the Rotary Club actively seek new members and engage in outwardly directed

activities. The Jaycees sponsor numerous gatherings and events, including recruitment meetings, awards ceremonies, and "community programs related to charity, sports, and public health." (468 U.S. at pp. 614, 621 [82 L.Ed.2d at pp. 468-469, 473-474].) Associate members, who may not vote or hold office, routinely attend these functions. (*Id.*, at pp. 613, 621 [82 L.Ed.2d at pp. 468, 473-474].) "The programs, products, and other activities of the organization are all regularly featured in publications made available to the membership, including a magazine entitled 'Future.' " (*Id.*, at p. 614 [82 L.Ed.2d at p. 469].) The Rotary Clubs carry on many of their "central activities . . . in the presence of strangers. . . . Members are encouraged to invite business associates and competitors to meetings. At some Rotary Clubs, the visitors number 'in the tens and twenties each week.' [Citation.] . . . The clubs are encouraged to seek coverage of their meetings and activities in local newspapers. In sum, Rotary Clubs, rather than carrying on their activities in an atmosphere of privacy, seek to keep their 'windows and doors open to the whole world,' [citation]." (481 U.S. at p. 547 [95 L.Ed.2d at p. 485].)

The Club bars its doors and has virtually no windows, at least in the metaphorical sense. The Club associates at a large historic mansion closed to the public. The doors do not open from the outside; members and guests must identify themselves and be admitted by security staff. No member may bring the same person as a guest more than four times a month. It appears a nonmember who is perhaps not a guest may call at the Club for a member, but the security guards apparently have discretion to deny entry. Any such person may not leave a certain confined area in which they must await the member. As noted, the proceedings at the Club facility may not be described or photographed. This atmosphere of privacy recalls the Central Intelligence Agency, not the open doors and windows of the Rotarians.[5]

The Club is more than sufficiently intimate to be located within that portion of the associational privacy continuum deserving of constitutional protection. ■ The next question is whether that protection extends to the nondisclosure of the membership list. The Board contends that even if the Club enjoys a right to associational privacy the disclosure of the membership list to a duly authorized taxing authority would be an insignificant infringement on that right. The Board argues that disclosure would not alter, restrict

---

[5]The Board relies on *Warfield* v. *Peninsula Golf & Country Club* (1989) 214 Cal.App.3d 646 [262 Cal.Rptr. 890], for the proposition that the Club is not selective because nonmember guests may attend the Club premises and partake of the Club restaurant's meal service. This factor alone is not determinative of the degree of intimacy of a private club, as the *Warfield* court recognized by leaving open the question of proof of the "crucially important issues of degree of exclusivity maintained and the nature of the intimate . . . associational rights involved . . . ." (*Id.*, at p. 657.)

or otherwise tangibly impair the social relationships among Club members because the governmental activity involved is not the prevention of their association.

Certain federal decisions do suggest that to prevent membership list disclosure an invocation of the right of associational privacy is only the first step. The organization must also make a prima facie showing that disclosure of its list of members would cause an objective chilling of associational rights, such as harassment or loss of membership. (*Brock* v. *Local 375, Plumbers Intern. Union* (9th Cir. 1988) 860 F.2d 346, 349-350, & 350, fn. 1; see *McLaughlin* v. *Service Employees Union, AFL-CIO* (9th Cir. 1989) 880 F.2d 170, 175; *O'Neal* v. *United States* (N.D.Ind. 1985) 601 F.Supp. 874, 879-880.) These decisions follow the suggestion of *Buckley* v. *Valeo* (1976) 424 U.S. 1, 71-72 [46 L.Ed.2d 659, 717-718, 96 S.Ct. 612], that merely subjective fear of reprisal or other adverse impact is insufficient to show an infringement of associational rights. *Buckley*, however, described a diluted standard of "reasonable probability" of harm to alleviate an undue burden of proof on the part of the group claiming constitutional protection. (424 U.S. at p. 74 [46 L.Ed.2d at p. 719].)

Curiously, the California cases interpreting federal law seem to assume that once a group qualifies for the right of associational privacy, any disclosure of members is adverse. (See, e.g., *Church of Hakeem, Inc.* v. *Superior Court* (1980) 110 Cal.App.3d 384, 388 [168 Cal.Rptr. 13].) In any event the federal test is easily met by the Club. One Club member stated that the members cherish their personal relationships, established after a painstaking selection process, and that the lifting of privacy would "change the environment of the Club, . . . discourage present members from maintaining their memberships and would inhibit" applications for new members. Another member, who has been audited in the past, stated that submission to a tax audit solely because of his club membership would be harassing and annoying. This member also noted past public criticism of the Club and its discriminatory character and stated his belief that he and other members "might be subjected to public abuse and contempt if the fact of our membership in the Club is disclosed." The member received a death threat when he was president of the Club.

This exceeds the subjective concerns discussed in *Buckley*. If prospective members of an organization know that they will be subject to random tax audits solely by virtue of their membership, they may decline to become a member of the group. If there is anyone other than an auditor who enjoys the experience of a tax audit, that person has yet to emerge from obscurity.

It is worth noting that the specter of a tax audit solely because of membership in a private group is chilling. If there were questions concerning

deductibility of expenses related to a bridge club, neighborhood improvement association or book discussion group, which might happen to limit membership by age, sex or religion, the members of such groups would be surprised indeed to have their names turned over to government tax auditors.

The Board nevertheless maintains that the Club's concern over public disclosure is ill-founded because the members' names and addresses will be kept confidential by the Board and used only for legitimate tax collection purposes. The Board reminds us that Government Code section 11183 makes it a misdemeanor to divulge confidential information obtained by administrative subpoena, and that Revenue and Taxation Code section 19282 prohibits the Board from divulging confidential taxpayer information. However, the Club's main privacy objection is to the dissemination to the Board itself, who will use the heretofore confidential information to conduct a tax audit on selected Club members. The right to privacy exists to permit the citizen to shield him or herself from the prying eyes of government agents; government intrusion must have some other justification than the promise that the information will not be shared with other citizens.[6]

The Board also attempts to discriminate between expressive and intimate associations, contending that only the former enjoys membership list protection. The Board observes that *N.A.A.C.P.* v. *Alabama* and all the other membership list cases involve expressive associations for political speech, religious affiliation, etc. These cases stress that disclosure of membership lists would chill expressive rights and lead to government or public reprisals for unpopular advocacy. (See, e.g., *N.A.A.C.P.* v. *Alabama, supra,* 357 U.S. at p. 462 [2 L.Ed.2d at pp. 1499-1500]; *Britt* v. *Superior Court, supra,* 20 Cal.3d at pp. 854-855.) Because this element is lacking in a purely social group advocating no viewpoints, the Board reasons that only expressive groups enjoy the right to retain their membership lists free from governmental snooping.

The Board presents no authority for the premise that intimate associations are relegated to the basement of First Amendment protection while expressive ones glide to the penthouse. Under the Board's argument, groups which eschew the controversy of political advocacy for the comforting hearth of

---

[6]The Board relies on *Tom* v. *Schoolhouse Coins, Inc., supra,* 191 Cal.App.3d at page 830, for the proposition that Government Code section 11183 was used to deflate a membership list privacy claim. *Tom* involved a list of investors in collectible coins, a commodity subject to securities regulation. The court held the list enjoyed *no* protection by the right of associational privacy given the heavy regulation of the commodity. The passing comment regarding section 11183 is dicta.

private social intercourse would become only second class citizens in the nation of the First Amendment. We must, however, be just as constitutionally concerned about a government request for a list of a person's intimate friends, or of their sexual partners (see *Boler* v. *Superior Court* (1987) 201 Cal.App.3d 467 [247 Cal.Rptr. 185]), as we would about a request for a list of members of that person's political organizations. If anything, the identities of one's intimate associates, persons who never remove themselves from the enclave of the purely private group to engage in public advocacy, would seemingly be entitled to greater privacy, not lesser.

We conclude that the Club's membership list is protected by its members' First Amendment right of intimate associational privacy. ■ That right, of course, is not absolute. The state may overcome that right if disclosure is both justified by a compelling state interest (*N.A.A.C.P.* v. *Alabama, supra,* 357 U.S. at p. 463 [2 L.Ed.2d at p. 1500]; *Buckley* v. *Valeo, supra,* 424 U.S. at pp. 66-68 [46 L.Ed.2d at pp. 714-716]) *and* is the least intrusive method to satisfy that interest (*Shelton* v. *Tucker* (1960) 364 U.S. 479, 488 [5 L.Ed.2d 231, 237-238, 81 S.Ct. 247]). The state bears a "particularly heavy" burden of establishing a compelling state interest (*Britt* v. *Superior Court, supra,* 20 Cal.3d at p. 855). "It is basic that no showing merely of a rational relationship to some colorable state interest would suffice; in this highly sensitive constitutional area, '[o]nly the gravest abuses, endangering paramount interests, give occasion for permissible limitation.'" (*Sherbert* v. *Verner* (1963) 374 U.S. 398, 406 [10 L.Ed.2d 965, 971-972, 83 S.Ct. 1790], quoting *Thomas* v. *Collins* (1945) 323 U.S. 516, 530 [89 L.Ed. 430, 440, 65 S.Ct. 315].) Even if such a compelling interest is present, it "cannot be pursued by means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved." (*Shelton* v. *Tucker, supra,* at p. 488 [5 L.Ed.2d at p. 237], fn. omitted; see *Pollard* v. *Roberts* (E.D.Ark. 1968) 283 F.Supp. 248, 257, affd. *sub nom. Roberts, Judge* v. *Pollard,* (1968) 393 U.S. 14 [21 L.Ed.2d 14, 89 S.Ct. 47] [three-judge court]; *Britt* v. *Superior Court, supra,* at pp. 855-856.)

■ In its attempt to establish a compelling state interest, the Board notes the strong state and federal public policy against sex discrimination in public accommodations (Civ. Code, § 51; *Isbister* v. *Boys' Club of Santa Cruz, Inc.* (1985) 40 Cal.3d 72 [219 Cal.Rptr. 150, 707 P.2d 212]; *Bd. of Dirs. of Rotary Int'l* v. *Rotary Club, supra,* 481 U.S. 537 [95 L.Ed.2d 474]). The Board implies that if, as a private group, the Club may legally discriminate, the regulation against tax deductions for discriminatory club expenses nevertheless furthers the public policy against discrimination by preventing taxpayer

subsidization of such behavior. The Board then concludes the policy against discrimination is sufficient to outweigh the Club's right of privacy.

The Board couches its argument in terms of sex discrimination when, as noted *ante*, there is no record evidence of such discrimination except a 40-year-old document. Assuming, however, for present purposes that the Club does discriminate against women, or that there is a public policy of similar vitality against age discrimination, the Board fails to meet its burden. The Board confuses public discrimination, which is illegal, and private discrimination, which seems not to be. The issue of whether the Club may or may not discriminate is not before us. The issue is whether the list may be disclosed to enforce the regulation against prohibited tax deductions.

We may assume for present purposes that the tax regulation is valid, in light of the state's interest in not subsidizing discrimination against its citizens. Indeed, it is without question that the state has a legitimate and compelling state interest generally in the battle against discrimination on the basis of race, gender, age, national origin, or other invidious categories of discrimination. (*Roberts* v. *United States Jaycees, supra*, 468 U.S. at p. 625 [82 L.Ed.2d at p. 476]; *Olympic Club* v. *Superior Court* (1991) 229 Cal.App.3d 358 [282 Cal.Rptr. 1]; *Warfield* v. *Peninsula Golf & Country Club, supra*, 214 Cal.App.3d at pp. 656-657.) The pertinent question is whether the state's general interest in combatting discrimination through the medium of disallowance of certain income tax deductions is sufficiently compelling to require disclosure of a constitutionally protected list of intimate associates.

We conclude that the Board has no compelling state interest because it has no evidence or reason to suspect that Club members are violating the regulation. Indeed, the Board essentially concedes that it is fishing. The Board candidly admits it wants the membership list *so it can determine whether or not* a violation occurred by conducting random audits of members of the Club. The only evidence of possible violations shows compliance. Several Club members have filed declarations stating that they do not deduct Club expenses, and each monthly bill bears a notice to the member that such deductions violate the law. While mass audits would be the most convenient means of determining whether a Club member violated the regulation, the administrative convenience of the state cannot vitiate a constitutional right of privacy. (See, e.g., *Wood* v. *Superior Court, supra*, 166 Cal.App.3d at p. 1148.)

The Board simply has no factual basis for a compelling state interest sufficient to overcome the Club's right of privacy. The Board's general duty

to enforce tax laws does not give it carte blanche to override the Constitution, no more than the police officer's general duty to enforce the law gives him or her the right to rummage through the personal effects of a suspected criminal without warrant or probable cause. ▮ Government administrative agencies are not permitted to subpoena constitutionally protected information regarding an individual's intimate personal associations simply to seek "assurance the law is not violated." (*Board of Medical Quality Assurance* v. *Gherardini, supra,* 93 Cal.App.3d at p. 680; *Wood* v. *Superior Court, supra,* 166 Cal.App.3d at p. 1150 [government agency using administrative subpoena for privileged records must make "sufficient factual justification" of good cause that records will show law violation].) In both *Gherardini* and *Wood* the courts held that broad requests for protected information, without any showing of particularized need or specific relationship to a precise, suspected act of wrongdoing, did not present a compelling state interest sufficient to overcome the right of privacy.

The Board suggests that this conclusion would lead to the absurdity of requiring a tax authority to know of tax violations in advance of the very audit designed to ferret out those violations. That is an overstatement of the result of nondisclosure. This is not a case of an ordinary tax audit or investigation; the Board seeks to compel disclosure of a constitutionally protected list of intimate associates. Moreover, even if the Board had some information that a member or a few members violated the regulations, it would still not be permitted to violate the constitutional rights of the hundreds of other innocent members. (*Church of Hakeem* v. *Superior Court, supra,* 110 Cal.App.3d at p. 389.)

▮ Even assuming a compelling state interest, the Board would have to establish that disclosure of the list is the least intrusive method available to achieve its objective. Random audits of persons based solely on their membership in a private organization are serious intrusions. (Counsel for the Board twice stated at oral argument that a tax audit "is not a particularly intrusive action by the government." We respectfully suggest to counsel that this opinion is probably shared by only a very small minority of American taxpayers.)

The Club has suggested alternative methods to determine whether members are making improper deductions, such as audits focusing on wealthier male Bay Areans with certain occupations, certain income levels, and excessive business deductions. At oral argument we asked the Board why the state tax forms could not be simply and easily amended to require attachment of a schedule listing the names of all organizations to whom the taxpayer has paid business expenses which are deducted. The Board failed to give a

satisfactory answer why such less intrusive measures as form changes—which do not appear expensive or difficult—could not be employed. When the alternative is wholesale random audits of individuals who have committed no tax violations just to catch a few who may have, based solely on those individuals' membership in a particular organization, the First Amendment right to associate freely commands that these alternative methods must be explored.

## IV

We conclude that the Club is constitutionally entitled to protect its membership list from disclosure to the government on the circumstances here presented, where the Board has neither met its burden of showing a compelling state interest nor established that the elephant gun of membership list disclosure is the only way to bring down the flea of the occasional tax cheat. Thus, the writ shall issue to preserve the privacy of the list.

The Board is engaged in the commendable task of ensuring that discriminatory clubs do not engage in their invidious practices at taxpayer expense. Section 17201, now embodied in the statutory law of California (Cal. Code Regs., tit. 18), trumpets for all to hear that even private, intimate discrimination is repugnant to modern sensibilities and will not be supported by tax benefits.

But the First Amendment necessarily affords to the objectionable the same protection as the popular. Although the state has a compelling interest in combatting discrimination in general, government agencies—however laudable their overall purpose and however odious their targets—cannot invade the privacy of intimate associations absent some information sufficient to show that the compelling state interest will be specifically fostered by the invasion and that no less intrusive method is available. First Amendment safeguards are not reduced in magnitude by the prevailing political and social judgment on the beliefs or practices which are entitled to their protection.

Let a peremptory writ of mandate issue commanding respondent superior court to vacate its order enforcing the administrative subpoena and to enter a

new and different order denying the Board's motion for enforcement. Petitioner shall recover its costs in this proceeding.

King, J., and Haning, J., concurred.

The petition of real party in interest for review by the Supreme Court was denied September 26, 1991. Arabian, J., was of the opinion that the petition should be granted.